THE STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. JOHANNA DE LORENZO AND CHRISTIAN NEUPERT, PLAINTIFFS IN ERROR.

Argued March 8, 1911—Decided May 12, 1911.

1. The constitution of this state does not prohibit the legislature from passing general laws providing for the manner in which and the persons by whom jurors shall be selected, drawn, summoned or empaneled.

2. The mention in the constitution of the office of sheriff does not constitute a limitation upon the legislature by which it is prohibited from enacting laws the effect of which is to subtract from the powers exercised by sheriffs at the time the constitution was adopted.

3. When a later constitution adopts a provision of an earlier one that has received a certain practical construction such provision is deemed to be adopted as thus construed.

4. The framers of the constitution of 1844 having adopted the provision of the constitution of 1776 with respect to sheriffs, with knowledge of the practical construction that intervening legislatures had placed upon such provision, the presumption is that in adopting such provision such construction was also adopted.

5. *Virtue* v. *Freeholders of Essex Co.*, 38 *Vroom* 139, disapproved.

6. Courts do not invalidate, as contrary to the constitution, a legislative enactment that is supportable under a view of the constitution that it was permissible for the legislature to take.

7. Constitutional limitations are to be established and defined by words that are found written in that instrument and not by reference to some spirit that is supposed to pervade it or to underlie it or to overshadow its expressed provisions.

8. The supplement to "An act concerning juries (*Pamph. L.* 1906, *p.* 218) by which lists of jurors selected by sheriffs are subjected to reform by judges of the Common Pleas is a valid enactment which the legislature was not prohibited from passing either (*a*) by article 1, section 7 of the constitution, "the right of a trial by jury shall remain inviolate," or (*b*) by article 7, section 2, paragraph 7, "sheriffs and coroners shall be elected by the people of their respective counties."

On error to the Supreme Court.

For the plaintiffs in error, *Joseph M. Noonan.*

For the defendant in error, *Pierre P. Garven,* prosecutor of the pleas.

The opinion of the court was delivered by

GARRISON, J. This writ of error brings up a judgment of the Supreme Court affirming a judgment of the Hudson Oyer convicting the plaintiffs in error of a statutory offence. The error assigned is the overruling by the trial court of a challenge to the array of petit jurors. The ground of this challenge was that the act of April 16th, 1906, under which the panel was drawn, was unconstitutional. The Supreme Court upheld the act in a *per curiam* that referred to an opinion delivered at the same term upon a review of a judgment for a different offence against the same defendants where the same constitutional question was raised and decided. *State* v. *De Lorenzo,* 51 *Vroom* 500.

The question immediately before us is the correctness of this judgment of the Supreme Court, the ultimate question being the constitutional power of the legislature to enact the statute in question. The statute, the constitutionality of which is thus challenged, is a supplement to "An act concerning juries" (*Pamph. L.* 1906, p. 218), and the provision upon which its constitutionality is attacked is that which requires the judge of the Common Pleas to appoint jurors to the general panel in substitution for jurors selected and drawn by the sheriff. That the statute expressly authorizes this to be done is clear; that such legislation works a radical change in the manner of selecting jurors and subtracts from the exclusive function of the sheriff in that respect cannot be denied. The sole question is whether under the constitution of this state the legislature may thus change the manner in which jurors shall be selected, and this, as a judicial inquiry, resolves itself into the question of the existence of a constitutional limitation by force of which the legislature is prohibited from changing the manner of selecting jurors from that in use at the time the constitution was adopted.

Counsel for the plaintiffs in error contends that such a limitation exists and that it is imposed on the legislature by the constitution in two different ways—*first,* by the express language of article 1, section 7, "the right of a trial by jury shall remain inviolate," and *second,* by an imperative implication that he thinks arises from the language of article 7, section 2, paragraph 7, "sheriffs and coroners shall be elected by the people of their respective counties," the implication being, as counsel contends, that the attributes and faculties of the office of sheriff as they existed at the time of the adoption of the constitution are, by this mention of the office in the constitution, crystallized and rendered immune from alteration or subtraction by the legislature.

With respect to the first of these contentions we think that the meaning and force of article 1, section 7, and the extent to which it constitutes a limitation upon the legislative branch of the government are not open to question since the decision of this court in *Brown* v. *State,* 33 *Vroom* 666. In the applica-

tion to the present case of the fundamental rules then laid down it is worthy of consideration that the framers of the constitution of 1844 carefully refrained from the adoption of the language of the constitution of 1776, which dealt with "the right of trial by jury," which it provided should "remain confirmed," and in its stead dealt with "the right of a trial by jury," which it provided should "remain inviolate." In our Supreme Court, in the case of *Clayton* v. *Clark*, 26 *Id.* 539, it was pointed out that "the language of that instrument (the constitution) in respect to the right of this mode of trial is that it shall remain inviolate, not that it shall be unalterable;" and in *Humphrey* v. *Eakeley*, 43 *Id.* 424, in treating of this same language, it was said: "Without laying too much stress upon verbal definition, it must not be overlooked that the essential meaning of 'inviolate' is freedom from hurt, harm, defilement, profanation or such other idea connoting partial destruction or substantial impairment, and that it in no sense imports immunity from all regulation." Subject to these considerations the doctrine illustrated by State *v.* Brown disposes in our judgment of the first ground of constitutional limitation contended for by the plaintiffs in error. We are thus brought in line with the decisions of many other states having substantially similar constitutional provisions, for the citation of which reference may be made to 24 *Cyc.* 186, and 12 *Encycl. Pl. & Pr.* 273.

Entirely apart from any of these considerations is the provision of the amendments to the constitution of 1875, by which the legislature, while expressly prohibited from passing local or special laws for the selection and empaneling of jurors, is enjoined or at least authorized to enact general laws for such purposes.

The second contention of the plaintiff in error is that the mention of the office of sheriff in the constitution of 1844 constituted *ipso facto* a limitation imposed by that instrument upon the legislature by force of which the legislature is forever debarred from altering in any essential aspect the mode in which jurors were selected by that official at the time of the adoption of the constitution. Upon this ground, as well as

upon that already stated, the contention of counsel carried by himself to its logical extreme, is "that the people of New Jersey * * * must be content forever with precisely that kind of trial by jury that was practiced in New Jersey when the constitution was adopted." This contention would present more of novelty than of difficulty were it not that it is directly supported by the decision of the Supreme Court in the case of *Virtue* v. *Freeholders,* 38 *Vroom* 139. In that case the Supreme Court had before it on *certiorari* the question of the validity of a resolution of the board of freeholders of Essex county by which the board assumed the custody of its common jail. There being legislative authority for such resolution the question considered and decided was the constitutionality of such legislation, the decision being that it was unconstitutional. The ground of this decision and the process of reasoning by which it was reached were as follows: The constitution, article 7, section 7, provides that sheriffs shall be elected by the people of their respective counties. As no mention is made of the duties to be performed by the sheriff or of the functions of his office the framers of the constitution must be presumed "to have intended that the designation of the office *eo nomine* should carry with it all the substantial powers, duties and functions which pertained to it at common law," one of which was the custody of the common jail. Having reached this conclusion as to the implied powers of sheriffs in the absence of legislation, the court then took up the controverted question on which the case turned, namely, "Can the legislature detach from the office of sheriff the custody of the common jail and of the prisoners confined in that institution, and commit such custody to some other officer to be selected by that body?" This question, which can be answered in the negative only by the discovery in the constitution of such a limitation upon the legislative branch of the government, was disposed of as follows: "We think that this question must be answered in the negative. As was said by Mr. Justice Cole in *State* v. *Brunst,* 26 *Wis.* 412, if the legislature can do this no reason can be perceived why it may not also strip the office of every other power, duty or function which pertains to it, and

leave to the electors of the state only the privilege of choosing
an officer who would be sheriff in name but with no power to
perform any of the duties or exercise any of the functions be-
longing to that office. \* \* \* We conclude, therefore, that
the various statutes which have been referred to so far as they
deprive the sheriffs of the custody of the common jail of their
respective counties and of the prisoners confined therein and
place it in the hands of boards of freeholders are inoperative
and void."

We are not satisfied with this reasoning of Mr. Justice Cole,
and are not able to give to the contingency mentioned the con-
clusive effect accorded to it, which seems to us to be in the
nature of a *petitio principii.* Moreover, the underlying doc-
trine on which the decision rests seems to us, for reasons
presently to be given, to be a radically unsound one, for such
underlying doctrine is nothing less than that the mention in
the constitution of an office by its titular designation consti-
tutes an implied limitation upon the legislative branch of the
government by which it is debarred from enacting any law the
effect of which is to subtract in any way from the powers ex-
ercised by the incumbent of such office at the time the constitu-
tion was adopted. This doctrine, if sound, crystallizes, as of a
date long past, the many important relations in which through
their executive hand society and the courts come into contact
with the vital affairs of the people, by rendering all such
matters, as they existed at the adoption of the constitution,
sacrosanct and immune from change or control by the legisla-
tive branch of the government through which, in any truly
representative system, civilized society registers its progress
and the people free themselves from practices that have become
abuses. This, however, is not all, for what is true of the office
of sheriff must likewise be true of every other office designated
with a like purpose in the same article of the constitution, all
of which, under the doctrine stated, are thereby placed beyond
legislative control. In the class thus rendered immune must
therefore be placed not only coroners who are coupled in the
same section with sheriffs, but also clerks and surrogates of
counties, justices of the peace, prosecutors of the pleas, the

clerk of the Supreme Court, the clerk of Chancery, and the law and Chancery reporters, as to all of whom the constitution speaks as fully and to the same effect as it does in regard to sheriffs. The importance of such a doctrine in its bearing upon vital matters of public concern and as a correct rule of constitutional construction can hardly be overestimated.

In the present case the court below thought that the Virtue case might be distinguished upon the ground that "though the drawing of petit jurors has usually been done by the sheriffs of our respective counties, from colonial days down to the present time, it has never been the exclusive function of those officers to do so. Before New Jersey became a sovereign state, both civil cases and criminal misdemeanors were frequently tried in England before special or struck juries, and such juries were never selected by the sheriff." This does not in our opinion serve to distinguish the Virtue case from the one before us. If the underlying doctrine of the Virtue case be sound, the fact that lists of special jurors were made up by judges at the same periods when general panels of petit jurors were selected exclusively by sheriffs does not at all impair the authority of the decided case over a situation like the present in which the legislative scheme is, not the perpetuation of the existing differences between these two sorts of juries, but a direct subtraction from the plenary authority of the sheriff with respect to the sort of jury which at the adoption of the constitution was exclusively selected by him.

There have existed in England at various times methods for the selection of jurors that bore a much closer analogy to the statutory scheme now before us than do special or struck juries. Inasmuch, however, as such ancient methods were not in vogue in this state at the time of which either of our constitutions speaks, the decision of the Virtue case cannot be distinguished or the scope of its authority limited upon any such ground.

The decision in Virtue *v.* Freeholders, which was not brought to this court, was cited and relied upon in the Supreme Court in *Freeholders* v. *Kaiser, 46 Vroom 9.* In affirming the judgment in that case this court in a *per curiam* stated

that as to the Virtue case no opinion was expressed. In *Arbuckle* v. *Kelly,* 49 *Id.* 94, the case was cited by Mr. Justice Reed in the Supreme Court as overruling a previous decision of that court. With these exceptions the case has not been cited in our reports or been before this court. Brought now for the first time face to face with this decision of the Supreme Court and with the doctrine on which it must rest, we have, for reasons now to be given, reached the conclusion that such doctrine is unsound, and that for that reason such decision should be disapproved. We have further concluded upon the merits of the present case that the legislative enactment now before us was not prohibited by any limitation expressed in the constitution, and that none such can be implied from the mention in that instrument of the office of sheriff. Our reasons for disapproving the decision in the Virtue case and the reasons for our decision of the constitutional question in the present case necessarily run into each other at so many points that, to avoid going over the same ground, they will be included in a single statement.

The first reason for sustaining the constitutionality of the act of April 16th, 1906, and for disapproving the decision in the case of Virtue *v.* Freeholders is that discussed at length in the opinion of this court in the recent case of Attorney-General *v.* McGinnis (civil service case), where the conclusion reached was that in no doubtful case would a court pronounce an act of the legislature to be contrary to the constitution, and that a case was, in this sense, doubtful whenever such legislative act was supportable upon a view of the constitution which it was permissible for the legislature to take. 49 *Vroom* 346. Now, in regard to the functions of sheriffs under our constitution, three views may be taken. At one extreme is the view that sheriffs have such functions only as the legislature may provide under the constitutional requirement that it shall pass "all laws necessary to carry into effect the provisions of this constitution." Article X., section 12. At the other extreme is the view illustrated in the Virtue case, namely, that the powers of sheriffs are historical and are unalterable by legislation. Midway between these two extremes is the view that

sheriffs are to exercise such historical powers until otherwise provided by the legislature, which, while not the only view that can be taken or necessarily the correct view, is at least a permissible view for the legislature to take. If this be so, then under the doctrine of the civil service case, the courts cannot invalidate a statute that is supportable under such view merely because it seems to the courts that such view is not the correct one. Much, if not all, of what was said upon this point in the opinion cited applies to the question now before us and need not be repeated.

In this connection it is to be noted that when the framers of the constitution intended that a subject should be placed beyond legislative control they said so. Thus they said that the several courts of law and equity should continue with like powers and jurisdiction as if this constitution had not been adopted; that the compensation of certain officers should not be diminished during the term of their appointments; that special or local laws should not be passed for certain objects; and the whole of article 1 (the so-called Bill of Rights) is of this general nature. The presence of these express limitations and the decision of this court against implied limitations render it a matter of indifferent speculation in the present case whether the framers contemplated that the duties of sheriffs would be altered by legislation and said nothing to the contrary, or whether they did not contemplate it, and hence expressed no intention upon that subject. Equally and in either case it is a matter upon which, the constitution being silent, no limitation can be judicially implied.

Closely connected with the foregoing and resting upon the same authority is the second reason, namely, that the existence of a constitutional limitation upon the legislative power is to be established and defined by words that are found written in that instrument, and not by reference to some spirit that is supposed to pervade it or to underlie it or to overshadow the purposes and provisions expressed in its written language. Attorney-General v. McGinnis. The decision of the Supreme Court in the Virtue case is in this respect so contrary to the decision of this later case by this court that had the chrono-

logical relation of the two been changed it is to be assumed that the decision of the Virtue case would have been different. The two decisions cannot stand together, and in such case the earlier must give way to the later.

A further reason is that the duties of sheriffs were largely of parliamentary—that is, of legislative origin, and always subject to legislative change. In respect to the selection of jurors, which is the matter with which we are immediately concerned, it was conspicuously the fact that sheriffs had no abiding or exclusive function in the premises. Bacon, in his *Abridgement of the Law,* recites, among others, an act (3 *H.* 8, *c.* 12) by which every sheriff was required to put in his panel before a justice of jail delivery, by whom it "shall be reformed by putting to and taking out of the names of persons which so be impaneled by the sheriff by discretion of the same justice before whom such panels shall be returned, * * * and that the same panels so reformed by said justices be good and lawful." *Bouvier, Bacon's Abridg., tit. "Juries"* (7th ed.) 313. This provision, originally part of an act passed in 11 *H.* 7, which as a whole was suffered to expire in the second parliament of *H.* 8, was revived in 23 *H.* 8, "but the part of it which authorized the court to reform the panel was immediately re-enacted in this separate act," in the third parliament of *H.* 8. *Ibid. note by English editor.*

Similar legislative subtractions from the office of the sheriff were of common occurrence down to the act of 3 *Geo.* 2, *c.* 25, made perpetual by 6 *Geo.* 2, *c.* 27, which is critical as marking the substitution of the common or general panel for the separate panel. But this and subsequent acts prior to revolutionary times, instead of recognizing any exclusive right in the sheriffs to make out the list from which jurymen should be drawn, impressed into this service in conjunction with the sheriffs a host of officials not even connected with the courts, such as church wardens, overseers of the poor, constables, tythingmen and headboroughs. These statutes are recited in length in Bacon and in Viner's Abridgement, under the heading "Juries," and show conclusively what they are now cited as showing, namely, that when our constitution of 1776 was

framed, its framers knew that in providing for the appointment of sheriffs they were dealing with an officer whose functions were not immutable or exclusive, but, on the contrary, were subject to legislative alteration and control. Such being the meaning to be ascribed to the titular office of sheriff in the constitution of 1776, the officer so designated performed in this state the duties prescribed by the common law and the British statutes until our own legislature of 1796 enacted an elaborate statute defining the duties of such official, which, with subsequent legislative changes, still constitutes the measure of his powers and duties.

The important thing to be observed in this connection is that this legislative designation of the duties of this office, adhered to as it was for nearly fifty years prior to the constitution of 1844, constituted a contemporaneous construction of the constitution of 1776 to the effect that the office of sheriff mentioned in that instrument was amenable to the legislative department of the government. This consideration leads up to an established doctrine of constitutional construction which forms another and very important reason for the view I am supporting, namely, that when a later instrument adopts a provision of an earlier one that has received a certain construction, the provision is deemed to be adopted as thus construed. From this doctrine it follows that the constitution of 1844, when it adopted the provision of the constitution of 1776, with respect to sheriffs, did so with knowledge of the construction that intervening legislation had placed upon such provision, and with the intent that such construction should continue and prevail. Such in fact has been the case, for the provision with respect to sheriffs, which thus gained admittance to the constitution of 1844, has since that time uniformly and constantly received a similar legislative construction culminating in the Jury Commission act of 1888 (*Pamph. L., p.* 304), which, although it affected both grand and petit jurors, remained in force unchallenged as to its constitutionality until its repeal by a subsequent legislature. Many pages of *Hood's Index* are taken up with the citation of acts of this sort under the titles of "Sheriffs," "Juries," &c.

Passing now from the general principles of constitutional construction to an examination of the internal evidence presented by that instrument, we find a further argument in the plan and nomenclature adopted by the constitution itself. Article 1 is, as we have said, the so-called Bill of Rights, and is headed or entitled "Rights and Privileges." Articles 2 and 3 deal with the "Right of Suffrage" and "Distribution of the Powers of Government," and are so entitled. Articles 4, 5 and 6 take up the several branches to which such powers are distributed, and are respectively entitled "Legislative," "Executive" and "Judiciary." Having thus completed the distribution or assignment of the powers and functions by the exercise of which the government was to be conducted, article 7, under the title "Appointing Power and Tenure of Office," deals with the terms of certain offices, military and civil, and with the manner in which they shall be filled, some being filled by the governor, with the advice and consent of the senate, some by the senate and general assembly, some by the Supreme Court or the Chancellor, and others, among whom are clerks, surrogates, justices of the peace, coroners and sheriffs, by popular election. *It is in this connection, and in this connection alone, that the word "sheriff" is mentioned in the constitution.* The controlling significance of this internal evidence of the constitution itself is too patent to justify elaboration. This collocation of the office of sheriff, with the others just mentioned, has, however, a direct bearing upon the question of contemporaneous construction, since it is clear that if the constitution does not permit the legislature to subtract from the office of sheriff, neither does it permit of such subtraction in the case of any of the other offices of which like mention is made, so to speak, in the same breath. This being so, the long line of legislative acts, by which the powers of such other offices have been taken away and given to agencies created by the legislature, is evidence of a contemporaneous and inveterate construction of the constitution by that department of the government. The recording of instruments of conveyance has been taken away from clerks and given to registers of deeds. Coroners have been forced to share their powers with

county physicians. The civil and criminal jurisdiction of justices of the peace has been taken away from them and distributed among District Courts, police magistrates, recorders of cities and other legislative agencies, and the fees and emoluments of many of these offices, such as clerks, sheriffs, surrogates, prosecutors of the pleas, the clerk of the Supreme Court and the clerk in Chancery have been taken away and salaries fixed by the legislature substituted in their place.

Finally, and from a totally different source, a further reason may be given, which has been alluded to in another connection, namely, that the amended constitution deals specifically with the power of the legislature to pass laws for the "selecting, drawing, summoning or empaneling grand or petit jurors" (article 4, section 7, paragraph 11), prohibiting the employment of local or special acts for this purpose, while conferring the necessary authority, if not making it a positive duty to pass general laws for such cases. In regard to this provision of the constitution nothing need be added to its exposition by Chancellor Pitney in Attorney-General *v.* McGinnis.

The conclusion, as far as the present case is concerned, to which all of these reasons tend, is that the mention of the office of sheriff by the constitution gives rise to no limitation by which the legislature was prohibited from enacting the statute now before us ; and such a limitation appearing in no other way the act of April 16th, 1906, is a valid statute. This being so, the overruling by Mr. Justice Swayze in the Hudson Oyer of the challenge to the array was not erroneous, and hence the judgment of the Supreme Court affirming the judgment of the Oyer is itself affirmed, although upon a ground different from that taken by the Supreme Court.

*For affirmance*—THE CHANCELLOR, GARRISON, REED, PARKER, BERGEN, VOORHEES, BOGERT, VREDENBURGH, CONGDON, SULLIVAN, JJ. 10.

*For reversal*—None.