SPENCER A. WIGHT, Sr., MARY C. WIGHT, CLARA MESS-
MER AND MARCUS M. MESSMER, APPLICANTS, v.
NEW JERSEY RACING COMMISSION, FRED H. RYAN,
SECRETARY OF NEW JERSEY RACING COMMISSION,
AND GARDEN STATE RACING ASSOCIATION, RE-
SPONDENTS.

Argued June 12, 1942—Decided June 18, 1942.

Before Justices CASE, DONGES and COLIE.

For the applicants, *S. Rusling Leap.*

For New Jersey State Racing Commission and Frank H.
Ryan, secretary, *Vincent S. Haneman.*

For Garden State Racing Commission, *George H. Stanger.*

The opinion of the court was delivered by

CASE, J. The application is for a writ of *certiorari* to
review the proceedings of the New Jersey State Racing Com-
mission in granting a permit to the Garden State Racing
Association to hold meetings in Delaware Township, Camden

County, New Jersey, from July 18th, 1942, to September 12th, 1942, inclusive. The argument is, first and primarily, that the legislature, in order to give efficacious authority to any board or other body to permit pari mutuel betting at race tracks, must provide for the legalizing of the race track at which the betting is to be permitted and that the legislature in the pertinent legislation has not done so; second and, according to the argument, less essentially, that the statute specifies hours that do not conform to the constitutional provision.

It is first contended on behalf of the respondents that the persons who are applying for the writ do not possess the necessary *status*. We think otherwise. The petitioners are, in our opinion, qualified to seek the proposed review. It is next said that the applicants have been guilty of gross *laches* in seeking this prerogative writ; and we find substance in this contention.

The permit to Garden State Racing Association was issued November 6th, 1941. Every act against which the applicants would cast suspicion of illegality occurred on or before that day. The notice of the present application was dated, and the petition and supporting affidavits were drawn and signed on, June 5th, 1942—lacking one day of seven months from the concluding act in that chain of events which the applicants attack. Forthwith after the issuance of the permit construction of the racing plant was begun. The construction work was obvious. First the grading was done. The erection of buildings followed. The first buildings to be erected were fourteen stables, each containing 58 stalls. After the construction of the immense stables had been commenced, work was started on the grandstand and clubhouse, a structure 700 feet in length and in part four stories in height. Huge quantities of materials were delivered at the site and the employment of men ran as high as between 700 and 800 at one time. All of this was done in full view of the public and specifically of the applicants, who reside in the neighborhood. Photographs of the large covered grandstand show that even the seats have been installed. Applicants stood by and watched this enterprise reach the point where $1,250,000

had been expended and the racing plant was 95 per cent. completed before they came into court to test the validity of that which, to their contemporaneous knowledge, transpired seven months and more ago. They seek to explain this long and expensive delay by saying that no betting has yet been conducted and that news items that the pari mutuel betting machines were about to be actually installed did not appear in the public press until a few days ago. But they now know no more than they have constantly known. There has never been doubt, from the time of the introduction of the constitutional amendment in the legislature, that the purpose was to legalize the pari mutuel betting system at race tracks. And it adds nothing to the store of essential knowledge on the part of the applicants or any others who have interest, either *pro* or *con,* in the movement that the press has announced the imminent installation of the machines. The installation and use of the pari mutuel betting system was the end toward which, notoriously, the beginning was long ago made.

Nothing has occurred, legally speaking, to justify the application for a writ that had not occurred seven months ago, prior to the expenditure of a million and a quarter dollars on the assumption that the enterprise was lawful. No fraud or deception (*Freeman* v. *Hague,* 106 *N. J. L.* 137) is charged either against the Commission in issuing or against the Association in obtaining the permit. Assuming the statute to be good, no serious irregularity is charged. The real ground of the applicants' complaint was laid when the statute was passed on March 18th, 1940, and amended on May 16th, 1941; and the applicants were put on full notice and were burdened with the duty to exercise reasonable diligence when the permit was issued and the work openly begun.

"The writ of *certiorari,* however, being discretionary, may be refused when it appears that the public interest will suffer or private injustice will be done." *Bowne* v. *Logan,* 43 *N. J. L.* 421; *Daniel B. Frazier Co.* v. *Harvey Cedars,* 111 *Id.* 163; *Brown* v. *Atlantic City,* 5 *N. J. Mis. R.* 397. In public, or *quasi* public works, various waiting periods have been held to constitute *laches:* In *Porskievies* v. *Atlantic Highlands,* 13 *Id.* 586, two and one-half months from the

passage of the authorizing ordinance and six weeks from the awarding of the contract for the work; in *Brown* v. *Atlantic City, supra,* three months from the opening of bids and one and one-half months from the awarding of the contract. On April 30th, 1935, the City of South Amboy adopted an ordinance abolishing the office of city engineer. The incumbent sued out, on July 24th, 1935, a rule to show cause why a writ should not issue; held, *laches. McMichael* v. *South Amboy,* 14 *N. J. Mis. R.* 183. And a delay of two weeks in seeking a writ to review the granting of a liquor license has, aggravated by other incidents, been held *laches. Matthews* v. *Asbury Park,* 113 *N. J. L.* 205. This case is not one of public or *quasi* public work, nor is it on all fours with any of the cited cases, but the proceedings of a state board are in question and an application for a writ must of course be prosecuted with due diligence. What is due diligence must be determined on the facts of each particular case. *Seaman* v. *Monmouth County,* 15 *N. J. Mis. R.* 249. We think that the applicants herein did not move with that reasonable diligence to which they were impelled by known and pivotal events.

But while we entertain the view that the petitioners have by their delay estopped themselves from the present application, our disposition of the application rests also upon what we hold to be a lack of substantial merit. The primary fault charged against the proceedings is, as we have indicated, that the constitutional amendment limits the operation of the betting system to "duly legalized race tracks" and that the legislature has not sufficiently defined what constitutes a legalized race track. It is to be noted that no quesion of morals or of public policy is, or could be, under the legal and factual situation with which we are confronted, presented here. Those matters were determined by the people in adopting the constitutional amendment and by the legislature in enacting the pertinent legislation. It is only for us to consider whether there is merit in the contention that the statute does not give operative effect to the constitutional authority.

The constitution of 1844 provided: "No lottery shall be authorized by this state; and no ticket in any lottery not

authorized by a law of this state shall be bought or sold within the state." In 1897, following widespread indignation at certain gambling and betting operations, the section was amended to read as follows:

"No lottery shall be authorized by the legislature or otherwise in this state, and no ticket in any lottery shall be bought or sold within this state, nor shall pool-selling, book-making or gambling of any kind be authorized or allowed within this state, nor shall any gambling device, practice or game of chance now prohibited by law be legalized, or the remedy, penalty or punishment now provided therefor be in any way diminished."

That change in our constitutional law was remarked upon in *Dombrowski* v. *State,* 111 *N. J. L.* 546, as follows: "The purpose of the amendment was to forever bar gambling from the state." However, it was also remarked in that opinion that the remedy for those who desired a different situation was "by change in the organic law;" and such a change was made by the people on June 20th, 1939, in adopting a new constitutional amendment as follows (article 4, section VII, paragraph 2):

"It shall be lawful to hold, carry on, and operate in this State race meetings whereat the trotting, running or steeplechase racing of horses only may be conducted between the hours of sunrise and sunset on week days only and in duly legalized race tracks, at which the pari mutuel system of betting shall be permitted. No lottery, roulette, or game of chance of any form shall be authorized by the Legislature in this State, and no ticket in any lottery shall be bought or sold within this State, or offered for sale; nor shall pool-selling, book-making, or gambling of any kind be authorized or allowed within this State, except pari mutuel betting on the results of the racing of horses only, from which the State shall derive a reasonable revenue for the support of government; nor shall any gambling device, practice, or game of chance, or pari mutuel betting thereon now prohibited by law, except as herein stated and otherwise provided, be legalized, or the remedy, penalty, or punishment now provided therefor be in any way diminished."

The objective of the 1939 constitutional changes, in so far as they relate to the subject now under discussion, was to permit the pari mutuel system of betting at legalized race tracks. We attach no unusual meaning to the word "legalized." The word obviously bears the primary dictionary definition of "legalize," which is "to make legal." Consequently, a "legalized" race track is a race track that has been made legal for the purposes indicated.

Chapter 17 of the Pamphlet Laws of 1940 (amended by chapter 137, *Pamph. L.* 1941) is the legislation by which the legislature undertook to give operative effect to the constitutional amendment.

The statute is a comprehensive legislative scheme whereby the concession granted by the constitutional amendment in favor of pari mutuel betting is given practical operation. The statute is voluminous, fills twenty-four pages, and goes into a wealth of detail which we shall not undertake to fully recount. It sets up a commission, the New Jersey Racing Commission, the books and proceedings of which are to be open to the public and the members of which are subject to removal by the Governor for cause. That Commission is given jurisdiction over all persons who conduct or seek permission to conduct any race meeting whereat there is horse racing (running or in harness) for any stake, purse or reward (saving certain fairs and live stock exhibitions where betting is not allowed) and is given control by revocable license over persons employed in the training or racing of horses or in the betting system. No person who has been convicted of a crime involving moral turpitude may be employed in any capacity at a track. No person or association may conduct such a race and no track may be the scene of such a race unless a permit is first obtained from the Commission and unless specified steps are taken and a certain standard of conduct is maintained—some of these are mandatory statutory requirements and some are within the discretion of the Commissioners—both before and after the issuing of the permit. Racing permits may be withheld and, after being granted, are subject to revocation. The identity of the applicant must be established. A deposit of $10,000, subject to forfeiture, must be

made with the filing of the application. An approved bond in the amount of $100,000 for running races and $25,000 for harness races must be filed within ten days after the Commission's allotment of racing dates. The times for filing applications are fixed and the racing season and hours are determined. A lower limit of $1,000 is ordained for the purse in running races. Periodic races limited to horses foaled in New Jersey are required unless there is insufficient competition. Running races may be permitted on not more than four tracks; and harness races on not more than seven; not more than one running race meet may be permitted on the same day; and harness races are not permitted within twenty-five miles one of the other on the same day. The application for permit to conduct a race meeting must give detailed information of various sorts, including the location of the tract or enclosure where the meeting is to be held; with it are to be such data as the Commission shall prescribe —including blueprints of the track (with specifications of its surface), of the grandstand and of the other buildings, all to be subject to the approval of the Commission. If the numerous conditions are complied with, the Commission issues a permit to conduct a race meeting as authorized by the act; but no permit shall be issued to permit running races on any track that is less than one mile in circumference or to permit harness racing on any track that is less than one-half mile in circumference. No permit shall apply to any tract other than the one specified therein; and no permit shall issue to permit one person or association to conduct a race meeting except at one track. The holder of such a permit, who conducts a race meet thereunder, may provide places within the racing enclosure at which the permitee may conduct and supervise the pari mutuel system of wagering by patrons on the result of the races there conducted, but the betting appurtenances and devices must conform to named statutory requirements.

The objective of the foregoing recital of some of the statutory provisions is to give a background for our view that the legislature did perform its essential function of fixing the specifications and the procedure by reason of and under which

a race track may be made legal within the purview of the constitution. When a track has in that sense been legalized, the privilege of pari mutuel betting there flows directly from the constitution. A legalized track, in our opinion, is such a track as is designated in a permit, extant and unrevoked, issued by the New Jersey Racing Commission in accordance with its rules and regulations, and under the provisions of the statute (grounded in the constitution). The legislature has not delegated its authority. It has, we think, sufficiently established a standard and has delegated only such acts and decisions as may lawfully be lodged with an agency charged with the administration of the law. *West Jersey and Seashore Railroad Co.* v. *Public Utility Board,* 87 *N. J. L.* 170; *State Board of Milk Control* v. *Newark Milk Co.,* 118 *Id.* 504.

The authority of the constitution applies only to racing "between the hours of sunrise and sunset." Section 27 of the statute as amended, in imposing limits upon the permit, provides that "no such permit shall be issued so as to permit horse racing * * * except on week days between the hours of twelve o'clock noon and six o'clock post meridian, Eastern Standard Time * * * nor shall any permit be granted for the holding or conducting of a horse race meeting * * * prior to the first day of April * * * or after the last day of November." Nothing can be made of the fact that the statutory racing day could have been made to, but does not, begin at sunrise. The permit issued to the Association authorizes racing from July 18th, 1942, to September 12th, 1942, between the hours of twelve o'clock noon and six o'clock post meridian, Eastern Standard Time. The argument of the applicants is that beginning with September 22d the setting of the sun, according to the almanac, occurs earlier than six o'clock, viz., on September 22d at 5:59 o'clock Eastern Standard Time, and that the statute does not appear to prohibit during the period of September 22d to November 30th racing up to the hour of six o'clock. It is susceptible of argument that the words "no" and "except" constitute a double negative equivalent to an affirmative authority; and, *contra,* there is the question of whether the present war timing throughout the country is to be considered as standard

time, and the argument that the statute was not intended to prolong the racing day in the late season beyond sunset. But in any event the permit granted to the Association complies with the limitations of both the constitution and the statute. It is not contended that the present permit may by any construction be held to violate the precise terms of the constitution.

We concluded that the major proposition advanced by the applicants has no merit, that the minor proposition injects a doubt on a question which is not fundamental and which, under all of the circumstances, ought not to evoke a writ in this instance. The applicants did not exercise the reasonable promptness to which they were impelled by the circumstances of the case.

The application will be denied, but without costs.