ATLANTIC CITY RACING ASSOCIATION, PLAINTIFF-RESPONDENT, v. THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY AND THE NEW JERSEY RACING COMMISSION, DEFENDANTS-APPELLANTS, AND THE NEW JERSEY SPORTS & EXPOSITION AUTHORITY, DEFENDANT-RESPONDENT.

Argued November 26, 1984—Decided March 27, 1985.

*Michael R. Cole,* First Assistant Attorney General, argued the cause for appellants (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *Andrea M. Silkowitz,* Deputy Attorney General, on the briefs).

*David M. Satz, Jr.,* argued the cause for respondent Atlantic City Racing Association (*Saiber, Schlesinger, Satz & Goldstein,* attorneys; *Steven S. Goldenberg,* on the brief).

*Joseph A. Rizzi* argued the cause for respondent The New Jersey Sports & Exposition Authority (*Winne, Banta, Rizzi, Hetherington & Basralian,* attorneys).

*Matthias D. Dileo* submitted a statement in lieu of brief on behalf of *amicus curiae,* Monmouth Park Jockey Club (*Wilentz, Goldman & Spitzer,* attorneys).

The opinion of the court was delivered by

MATTHEWS, P.J.A.D. (temporarily assigned).

We are requested in this appeal to interpret Art. IV, § VII, par. 2 of the New Jersey Constitution of 1947, which incorporates Art. IV, § VII, par. 2, as amended June 20, 1939 of the Constitution of 1844. Specifically, we are asked whether intertrack pari-mutuel betting on simulcast horse racing authorized by the Intertrack Wagering Act, *N.J.S.A.* 5:5–100 to 109, violates the constitutional provision because prior approval was not sought and obtained from the general electorate.

Plaintiff instituted this action under *N.J.S.A.* 2A:16–50 to 62, seeking a judgment declaring that an arrangement proposed by it would be permissible under the *N.J. Const.* of 1947, Art. IV, § VII, par. 2. Under the proposed arrangement, horse races conducted by New Jersey Sports & Exposition Authority at the Meadowlands would be simulcast live by television to plaintiff's track, Atlantic City Race Course, permitting plaintiff's patrons at Atlantic City to place pari-mutuel system wagers on horses running in those races and to incorporate their wagers into a central pari-mutuel pool at the Meadowlands track. Winning patrons at the receiving track would be paid the same amount that they would have received had they actually placed their wagers at the Meadowlands. *N.J.S.A.* 5:5–106. Alternatively, plaintiff sought an order approving a plan whereby, under the existing statutory framework, defendant New Jersey Sports &

Exposition Authority would lease plaintiff's facilities and simulcast Meadowlands races to Atlantic City, permitting plaintiff's patrons to place wagers on those races. This latter proposal has been referred to as the "extended Meadowlands" concept.

Named as defendants in the cause were the Attorney General, the New Jersey Sports & Exposition Authority (Sports Authority), and the New Jersey Racing Commission. Pursuant to *N.J.S.A.* 52:17A–4, the Racing Commission must follow the legal advice of the Attorney General, whose interpretation of *N.J. Const.* (1947), Art. IV, § VII, par. 2 is such that the simulcasting proposal submitted by plaintiff is prohibited. In a cross-claim filed against the other defendants, defendant Sports Authority joined in plaintiff's application for declaratory relief and sought a further ruling that federal law preempted any State prohibition of the simulcasting arrangements proposed by plaintiff.

All parties moved for summary judgment as to all claims. The trial court, in a formal opinion reported at 189 *N.J.Super.* 549 (Law.Div.1983), denied the validity under current law of the "extended Meadowlands" proposal because he found that *N.J. S.A.* 5:5–62 and 5:5–63, read both separately and jointly, unequivocally restrict pari-mutuel wagering on races to the track where a race is held. The court also rejected defendant Sports Authority's argument that the State's authority to regulate horse racing under *N.J.S.A.* 5:5–62 and 5:5–63 is preempted by federal legislation.

The trial court granted plaintiff's and defendant Sports Authority's motions for summary judgment holding that the simulcasting proposal contemplating the placing of wagers at licensed racetracks on races run in New Jersey's authorized racetracks is not constitutionally prohibited. He concluded, however, that since *N.J.S.A.* 5:5–62 and 5:5–63 limit such betting to the particular track where the race is being held, plaintiff's proposal is prohibited under existing statutes. Consequently, plaintiff's proposal would be "acceptable *if and only*

*if* it received *legislative* and *regulatory sanction* from the appropriate bodies authorized to put into effect the permitted forms of horse race wagering in New Jersey." 189 *N.J.Super.* at 560.

The Attorney General and the Racing Commission appealed from that portion of the trial court's decision that granted summary judgment as to the reach of *N.J. Const.* of 1947, Art. IV, § VII, par. 2. The Appellate Division affirmed, essentially for the reasons expressed by the trial court, in a *per curiam* opinion, one judge dissenting. 198 *N.J.Super.* 247 (1983). Defendants appeal to us as a matter of right. *N.J. Const.*, Art. VI, § 5, par. 1(b); *R.* 2:2-1.

Subsequent to the decision of the trial court, the Legislature passed, and the Governor signed into law, the Intertrack Wagering Act, *L.* 1983, *c.* 340, codified as *N.J.S.A.* 5:5-100 to 109. This law apparently sought to fulfill the legislative sanction called for by the trial court by providing for the simulcasting of and intertrack wagering on horse races conducted within the State. Although the act took immediate effect, it expired on January 1, 1985 unless it received approval of the electorate in the general election to be held in November 1984. During September 1984, the Legislature passed and the Governor signed into law *L.* 1984, *c.* 155, which repealed the requirement in *L.* 1983, *c.* 340 § 14 that the continuation of intertrack wagering be submitted to a public vote. In the statement annexed to the bill (S. 1545) the sponsor stated that the Appellate Division decision rendered unnecessary the need for a public referendum. The enactment further amended section 15 of *L.* 1983, *c.* 340 so as to authorize simulcasting and intertrack wagering on a permanent basis.

I.

The evolution of legalized gambling in New Jersey has been grudging. Because of widespread abuses in various gambling activities and the attendant social and economic ills engendered,

gambling has historically been viewed as an undesirable activity. *Caribe Hilton Hotel, Inc. v. Toland,* 63 *N.J.* 301, 304 (1973). Although the Constitution of 1776 had no provision on gambling, the framers of the Constitution of 1844 enacted an express prohibition against lotteries as well as the buying and selling of lottery tickets in the State:

> No lottery shall be authorized by this state; and no ticket in any lottery not authorized by a law of this state shall be bought or sold within the state. [*N.J. Const.* (1844), Art. IV, § VII, par. 2.]

In 1897, because of widespread concern over existent gambling operations, *see Wight v. N.J. Racing Commission,* 128 *N.J.L.* 517, 521 (Sup.Ct.1942), anti-gambling forces successfully sought an amendment of the State Constitution to bar all gambling in the State. *Dombrowski v. State,* 111 *N.J.L.* 546, 547 (Sup.Ct.1933). That amendment provided:

> No lottery shall be authorized by the legislature or otherwise in this state, and no ticket in any lottery shall be bought or sold within this state, nor shall pool-selling, book-making or gambling of any kind be authorized or allowed within this state, nor shall any gambling device, practice or game of chance now prohibited by law be legalized, or the remedy, penalty or punishment now provided therefore be in any way diminished. [*N.J. Const.* (1944) Art. IV, § VII, par. 2.]

In a special election conducted in 1939, the people, prompted principally by the financial havoc wrought by the Depression, modified the broad anti-gambling ban in a partial retreat from the total prohibition of the 1897 amendment. *New Jersey Sports & Exposition Authority v. McCrane,* 119 *N.J.Super.* 457, 510 (Law Div.1971), aff'd as mod., 61 *N.J.* 1, app. dism. *sub nom. Borough of East Rutherford v. New Jersey Sports & Exposition Authority,* 409 *U.S.* 943, 93 *S.Ct.* 270, 34 *L.Ed.*2d 215 (1972), aff'd on appeal after remand, 62 *N.J.* 248, *cert.* den., 414 *U.S.* 989, 94 *S.Ct.* 291, 38 *L.Ed.*2d 228 (1973). Intending to create a source of revenue, the people approved an amendment that legalized pari-mutuel wagering [1] on horse races:

---

[1] Pari-mutuel wagering is the system under which
"odds" are posted at the track from time to time until the race is begun, determined by the quantum of the bets placed on the several entries, those

*It shall be lawful to hold, carry on, and operate in this State race meetings whereat the trotting, running or steeplechase racing of horses only may be conducted* between the hours of sunrise and sunset on week days only and in *duly legalized race tracks, at which the pari-mutuel system of betting shall be permitted.* No lottery, roulette, or game of chance of any form shall be authorized by the Legislature in this State, and no ticket in any lottery shall be bought or sold within this State, or offered for sale; *nor shall pool-selling, book-making,* or gambling of any kind *be authorized or allowed within this State, except pari-mutuel betting on the results of the racing of horses only,* from which the State shall derive a reasonable revenue for the support of government; nor shall any gambling device, practice, or game of chance, or pari-mutuel betting thereon now prohibited by law, except as herein stated and otherwise provided, be legalized, or the remedy, penalty, or punishment now provided therefor be in any way diminished. [*N.J. Const.* 1844, Art. IV, § VII, par. 2 (emphasis supplied).]

A Constitutional Convention was convened in 1947 to revise the 1844 Constitution. Despite efforts to adopt an express constitutional provision declaring gambling solely a legislative matter or to omit any reference to gambling in the Constitution, I *Proceedings of the Constitutional Convention of 1947,* 355, 387 (*Proceedings* ), and thereby eliminate the 1939 prohibitions, the delegates and ultimately the voters of this State chose to reincorporate the restrictions imposed by the 1939 amendment:

No gambling of any kind shall be authorized by the Legislature *unless the specific kind, restrictions and control thereof have been heretofore submitted to, and authorized by* a majority of the votes cast by, *the people at a special election* or shall hereafter be submitted to, and authorized by a majority of the votes cast thereon by, the legally qualified voters of the State voting at a general election, except that, without any such submission or authorization; .... [*N.J. Const.* 1947, Art. IV, § VII, par. 2 (emphasis supplied).]

Thus, such racing as was authorized by the 1844 Constitution as amended in 1939 did not again have to be submitted to the voters for approval. Our inquiry, then, is whether intertrack

---

whose wagers were placed on the winning horse share the total stake, less a fixed percentage to the track management, in proportion to their respective contributions or wagers. *State v. Morano,* 134 *N.J.L.* 295, 298–99 (E. & A.1946).

wagering[2] on simulcast horse racing[3] is within the constraints of pari-mutuel betting on horse racing prescribed by the 1939 amendment incorporated by reference into the 1947 Constitution, or whether such an arrangement constitutes a new type of gambling as yet unapproved by the people.

## II.

In construing constitutional and statutory provisions, this Court has recognized that resort may be had to pertinent constitutional and legislative history for aid in ascertaining the true sense and meaning of the language used. *Richman v. Ligham*, 22 *N.J.* 40, 44 (1956); *Deaney v. Linen Thread Co.*, 19 *N.J.* 578, 584–85 (1955). Particularly relevant to our inquiry is the intent and objective of the framers of the 1947 Constitution as illuminated by historical commentary. *Application of Forsythe*, 91 *N.J.* 141, 148 (1982).

During the Constitutional Convention of 1947, the issue of gambling received more debate on the floor of the convention than any other constitutional provision. *R. Baisden, Charter for New Jersey: The New Jersey Constitutional Convention of 1947*, 36 (1952). Five possible alternatives concerning the gambling clause were considered by the delegates. II *Proceedings* 1073. In addition to the final version of the provision, the alternatives included:

 (a) the elimination of any reference to gambling in the Constitution;

 (b) the insertion of a clause prohibiting all gambling;

 (c) the liberalization of the existing gambling clause to permit, in addition to pari-mutuel betting, the conduct of games of chance by charitable, religious, fraternal or veterans organizations;

---

[2]*N.J.S.A.* 5:5–101(b) defines intertrack wagering as "parimutuel wagering on simulcast horse races by patrons at a receiving track and the electronic transmission of the wagers to the sending track."

[3]*N.J.S.A.* 5:5–101(f) defines simulcast horse races as "horse races conducted at a sending track and transmitted simultaneously by pictures to a receiving track."

(d) the liberalization of the existing gambling clause to permit limited but specified games of chance, to be defined, regulated and subject to local referendum without reference to charitable, religious, fraternal or veterans organizations.

Many members of the Convention believed that there should be no mention of gambling in the Constitution, I *Proceedings* at 350, 357, 363, 365, 379, 381; that it was a problem to be dealt with by the Legislature. I *Proceedings* at 352, 361, 363. The majority took the position that in view of the long history of constitutional restriction of the right of the Legislature to deal with gambling, the elimination of any such constitutional provision would create an impression that all types of commercial gambling might some day be legalized by the Legislature. I *Proceedings* at 353, 356, 376, 386, 441. It was believed that such an interpretation could have gone far toward defeating any Constitution adopted by the Convention.

Considerable opposition to liberalization of the then present gambling clause was expressed at the Convention. I *Proceedings* at 384, 430. The majority of the delegates were also opposed to a proposed provision prohibiting the Legislature from legalizing all forms of gambling because such a provision would constitute a return to the constitutional restriction as it existed prior to the adoption of the horse racing amendment in 1939. In reaching that conclusion, the Convention took into consideration the fact that the amendment authorizing pari-mutuel betting was adopted by popular vote just eight years before. I *Proceedings* at 354, 355, 362, 363, 366, 370, 431, 439.

The purpose of the 1947 provision, therefore, was to maintain the status quo as to gambling, which then consisted solely of pari-mutuel betting at the race track where a horse race was actually being run. I *Proceedings* at 431, 438, 442. Abundant discussion during the Convention supports this proposition. Senator Arthur W. Lewis, the author of the provision ultimately approved by the delegates and the people, stated:

Bear this in mind, Mr. President, ladies and gentlemen,—we have in New Jersey only one kind of gambling, and that is by virtue of the voice of the

people of New Jersey. How dare we, then, say there should be any other kind of gambling except only by and through the voice of the people of New Jersey?

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

Now, if my proposed amendment should meet with your approval, we leave the anti-gambling situation where we find it. We refer the gambling question to the Legislature, where it belongs, but with restrictions. We say the Legislature may frame any question or questions relating to a modification of our gambling laws, and submit those questions to the people for a vote thereon by the people.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

In any event, under my proposal the Legislature has the right to frame the question or questions to be presented to the people for a vote thereon, and it comes right back to the people to decide whether or not they want further modification. Is not that the answer to our problem today? Can we not include such a provision in the Constitution that merely provides, in substance, that the Legislature has the right to consider this problem: There shall be no more gambling in New Jersey, except what has already been authorized by the people, or except what may in the future be authorized by the people. The Legislature can only enact such laws relating to gambling, to become effective only if the people so vote at a general or special election. [I *Proceedings* at 355–56]

By adopting the Constitution of 1947, which contains Art. IV, § 7, par. 2, the people reaffirmed the sentiments implicitly expressed by the comprehensiveness of the 1939 amendment that any decisions as to the expansion of gambling in New Jersey were to be considered and resolved by its citizens at the polls and not by the Legislature. The adoption of the 1939 amendment in this historical context, following a forty-two year ban on all public gambling, suggests a cautious and restrictive approval of the circumstances under which the sole authorized activity, pari-mutuel wagering on horse races, would be allowed.

## III.

Unlike the federal constitution, a state constitution is not a grant but a limitation of legislative power. *Behnke v. New Jersey Highway Authority*, 13 *N.J.* 14, 24 (1953). While a constitutional limitation is in its very nature inflexible in meaning and immune to varying public opinion, social and economic needs arising from complexities of modern life call for new

applications of the principle. *Home Building and Loan Association v. Blaisdell,* 290 *U.S.* 398, 54 *S.Ct.* 231, 78 *L.Ed.* 413 (1934); *Euclid v. Ambler Realty Co.,* 272 *U.S.* 365, 47 *S.Ct.* 114, 71 *L.Ed.* 303 (1926). It can be accommodated to new needs, however, only where it will not contravene the intent of the instrument. *Behnke, supra,* 13 *N.J.* at 26. While it may be appropriate to give a liberal reading to what Justice Holmes referred to as the "great ordinances of the Constitution" as they may have relevance to the problems of the day, more literal adherence to the words selected in those clauses carefully defining the mechanics and administration of government is mandated. As Justice Mountain wrote in *Vreeland v. Byrne,* 72 *N.J.* 292 (1977):

> Not all constitutional provisions are of equal majesty. Justice Holmes once referred to the "great ordinances of the Constitution." Within this category would be included the due process clause, the equal protection clause, the free speech clause, all or most of the other sections of the Bill of Rights, as well as certain other provisions. The task of interpreting most if not all of these "great ordinances" is an evolving and on-going process. The history of the Federal Constitution clearly teaches that what may, for instance, be due process in one decade or in one generation will fail to meet this test in the next. And this is as it should be. The "great ordinances" are flexible pronouncements constantly evolving responsively to the felt needs of the times.
>
> But there are other articles in the Constitution of a different and less exalted quality. Such provisions generally set forth—rather simply—those details of governmental administration as are deemed worthy of a place in the organic document. Examples from our own Constitution might be the clause in Art. 4, § 4, ¶ 6 that requires bills and joint resolutions to be read three times in each house before final passage; or the provision in Art. 4, § 5, ¶ 3 declaring that upon a member of the Legislature becoming a member of Congress, his seat in the Legislature shall thereupon become vacant; or the requirement set forth in Art. 5, § 1, ¶ 2 that the Governor shall be not less than thirty years of age.
>
> Such constitutional provisions as these, and others like them, important as they doubtless may be, are entirely set apart from the "great ordinances" mentioned above, and as a matter of constitutional interpretation should receive entirely different treatment. Where in the one case the underlying spirit, intent and purpose of the Article must be sought and applied as it may have relevance to the problems of the day, in the other a literal adherence to the words of the clause is the only way that the expressed will of the people can be assured fulfillment. [72 *N.J.* at 304–05 (footnote omitted).]

Similarly, in construing the provisions of a constitutional amendment that effect a limited exception to a comprehensive constitutional prohibition of gambling it is the long-standing general policy of our courts to interpret those provisions narrowly and to refrain from extending them beyond their normal and common usage. *See, e.g., Karafa v. N.J. State Lottery Comm'n,* 129 *N.J.Super.* 499, 504 (Ch.Div.1974). New Jersey's comprehensive policy against all forms of gambling (except where specifically authorized by the people) has been clear and long-standing. *Carll & Ramagosa, Inc. v. Ash,* 23 *N.J.* 436, 445 (1957); *State v. Hozer,* 19 *N.J.* 301, 308 (1955); *State v. Morano,* 134 *N.J.L.* 295, 299–300 (E. & A.1946). This principle remains inviolate to this day. *See, e.g., Boardwalk Regency Corp. v. Attorney General,* 188 *N.J.Super.* 372, 375 (Law Div.1982). A proper reading of the 1939 constitutional amendment, which carves out a limited exception to the general ban on gambling, and which bars legislative initiative relative thereto, must accordingly proceed from a narrow construction of the language selected and not the liberal interpretation espoused by the trial court and the majority in the Appellate Division.

It is presumed "that the words employed in the Constitution have been carefully measured and weighed to convey a certain and definite meaning with as little as possible left to implication." *Behnke v. New Jersey Highway Authority,* 13 *N.J.* 14, 25 (1953); *Fischer v. Township of Bedminister,* 5 *N.J.* 534, 541 (1950). We should therefore "inquire as to the meaning the symbols of expression would most naturally and plainly convey, the sense most obvious to the common understanding ... [for] [t]he constitution was written to be understood by the voters * * *." *Gangemi v. Berry,* 25 *N.J.* 1, 16 (1957) quoting from *Cooley's Constitutional Limitations* (8th ed.) at 143 and *U.S. v. Sprague,* 282 *U.S.* 716, 51 *S.Ct.* 220, 75 *L.Ed.* 640 (1931). In permitting conduct that previously constituted criminal activity the draftsmen made clear the narrow extent to which the

activity would be tolerated—at race meetings, in duly legalized tracks, between the hours of sunrise and sunset, on weekdays only.[4]

The plain language of the 1939 amendment, in particular the juxtaposition of the phrases, "the racing of horses . . . in duly legalized tracks, at which the pari-mutuel system of betting shall be permitted . . ." is reasonably susceptible to only one interpretation, the authorization of pari-mutuel betting solely at the tracks where horse races are conducted. That this was the intent of the drafters is made apparent by the deliberate qualification of the place where pari-mutuel betting would be permitted, a limitation not made in the initial amendment proposals.[5] This interpretation is reinforced by consideration of the implementing legislation enacted in 1940.

---

[4]*N.J.S.A.* 5:5-84, approved by the people at a general election in 1966, subsequently authorized nighttime and Saturday racing.

[5]The Senate Committee Substitute for Assembly Concurrent Resolution No. 5, April 17, 1934 provided:

> No lottery shall be authorized by the Legislature or otherwise in this State, and no ticket in any lottery shall be bought or sold within this State, nor shall pool-selling, book-making or gambling of any kind be authorized or allowed within this State except pari-mutuel betting on such races as may be prescribed by the Legislature and from which the State shall derive a reasonable revenue for the support of government; nor shall any gambling device, practice or game of chance now prohibited by law, except as herein stated, be legalized, or the remedy, penalty or punishment now provided therefor be in any way diminished.

The Senate Substitute for this resolution introduced on April 30, 1934 similarly provided:

> It shall be lawful to hold, carry on and operate in this State, race meetings whereat the trotting, running or steeple-chase racing of horses may be conducted. No lottery shall be authorized by the Legislature or otherwise in this State, and no ticket in any lottery shall be bought or sold within this State, nor shall pool-selling, book-making or gambling of any kind be authorized or allowed within this State except pari-mutuel betting from which the State shall derive a reasonable revenue for the support of government; nor shall any gambling device, practice or game of chance now prohibited by law, except as herein stated, be legalized, or the remedy, penalty or punishment now provided therefor be in any way diminished.

## IV.

In order to determine the intent of the constitutional language, it is appropriate to consider the statutory enactments that were adopted virtually contemporaneously with the approval of the 1939 constitutional amendment. *Lloyd v. Vermeulen,* 22 *N.J.* 200, 210 (1956); *In re Hudson County,* 106 *N.J.L.* 62, 75 (Sup.Ct.1893). In two specific provisions of the legislation enacted to give operative effect to the constitutional amendment, the Legislature expressly limited the circumstances in which pari-mutuel wagering on horse races would be allowed. *N.J.S.A.* 5:5–62, as originally enacted, directed:

> Any permit holder conducting a horse race meeting under this act may provide a place or places *in the race meeting grounds or enclosure* at which such holder of a permit may conduct and supervise the pari-mutuel system of wagering by patrons on the result of the horse races conducted by such permit holder at such meeting, and such pari-mutuel system of wagering upon the result of such horse races held at such horse race meeting shall not under any circumstances, if conducted under the provisions of this act and in conformity thereto, be held or construed to be unlawful, other statutes of the State of New Jersey to the contrary notwithstanding. [Emphasis supplied.]

Thus, the Legislature clearly read the constitutional directive to permit pari-mutuel wagering on horse races only at a track at which a race was actually run. *N.J.S.A.* 5:5–63 confirmed this reading by further providing in pertinent part:

> No other place or method of betting, pool making, wagering or gambling shall be used or permitted by the holder of a permit, nor shall the pari-mutuel system of wagering be conducted on any races except horse races *at the track where such pari-mutuel system of wagering is conducted.* [Emphasis supplied.]

The intent of the phrase beginning with "nor shall" makes it unequivocal that the wagering contemplated by the Legislature was to be limited to horse races at the racetrack where the betting takes place. Moreover, "no other method of betting" obviously contemplated a patron placing his bet on the outcome of a given race with an employee of the permit holder at the racetrack where the race was being run. The apparent contemporaneous understanding of the amendment was that pari-mutuel betting on horse races was authorized only to the extent that the betting was conducted at the track where the race was

run. *See Wight v. N.J. Racing Commission*, 128 *N.J.L.* 517, 523 (Sup.Ct.1942).

"When a later instrument adopts a provision of an earlier one that has received a certain construction, the provision is deemed to be adopted as thus construed." *State v. DeLorenzo*, 81 *N.J.L.* 613, 623 (E. & A.1911); *accord, State by Parsons v. Standard Oil Co.*, 5 *N.J.* 281, 296 (1950), aff'd, 341 *U.S.* 428, 71 *S.Ct.* 822, 95 *L.Ed.* 1078 (1950); *McCutcheon v. State Bldg. Auth.*, 13 *N.J.* 46, 63 (1953). When the delegates and the people approved the Constitution of 1947, they did so with knowledge of the construction that legislation had placed on the 1939 amendment, and with the intent that such construction should continue and prevail. Such in fact has been the case, because *N.J.S.A.* 5:5–62 and 5:5–63 have remained intact from 1940 until their repeal and amendment subsequent to the commencement of this action.

The trial court and the Appellate Division majority nevertheless accepted as persuasive the contention that the inability of the public and the Legislature in 1939 and 1940 to have anticipated the technological possibility of simulcasting would permit a broad reading of the pertinent constitutional provision to allow for this limited form of "off-track" betting. We disagree. While the specific technological advances permitting simulcasting of racing might not have been anticipated by the draftsmen and voters who approved the 1939 amendment, the voters in 1947 were aware of existing technology, such as radio, film, and television, which could have enabled the transmission of a race to other racetracks or other locations at which patrons could place wagers. It is clear, however, from the language of the amendment and the statutes that such off-track wagering was not being sanctioned and in fact would constitute criminal activity. *State v. Western Union Tele. Co.*, 12 *N.J.* 468, app. dism., 346 *U.S.* 869, 74 *S.Ct.* 124, 98 *L.Ed.* 379 (1953). The public's intent therefore was to permit pari-mutuel wagering but only under the limited circumstances expressed in the Constitution and as implemented by the Legislature. Thus,

even if we found that a strictly literal or grammatical reading of the constitutional amendment would lead to a contrary result, that construction is required to be rejected as wholly inconsistent with the intent and objectives of the amendment. *Lloyd v. Vermeulen,* 22 *N.J.* 200, 205 (1956); *Richman v. Ligham,* 22 *N.J.* 40, 58 (1956); *cf. Erlanger Kennel Club v. Daughtery,* 213 *Ky.* 648, 281 *S.W.* 826 (Ct.App.1926), aff'd, 275 *U.S.* 509, 48 *S.Ct.* 158, 72 *L.Ed.* 398 (1927) (statutory exemption from criminal anti-gaming statute for wagers made "within the enclosure of a race course or track licensed by the State Racing Commission" not applicable to dog races, in part because such races were unknown at the time of enactment of the statute and therefore could not have been contemplated by the Legislature as an exempt activity).

## V.

In order for the Intertrack Wagering Act to be effective without prior endorsement by the electorate, intertrack wagering on simulcast races must be deemed a "specific kind" of gambling of which the "restrictions and control" have already been approved by the people pursuant to *N.J. Const.* of 1947, Art. IV, § VII, par. 2. The Law Division, citing *IGP-East Inc. v. Gaming Enforcement Div.,* 182 *N.J.Super.* 562 (App.Div. 1982), found that simulcasts from one licensed race track to another are a mere variation of pari-mutuel wagering on horse races and thus do not implicate the constitutional bar against legislative approval of gambling. Consequently, the public policies and purposes served by the 1939 amendment and the 1947 Constitution would be preserved because the Intertrack Wagering Act preserves the strick regulation by the New Jersey Racing Commission, including the licensing and monitoring of racetrack operations and the pari-mutuel pools. The constitutional provision relevant in *IGP-East,* Art. IV, § VII, par. 2, as amended at a general election on November 2, 1976, however, expressly authorizes the Legislature to determine the type of gambling games which may be conducted in casinos:

> It shall be lawful for the Legislature to authorize by law the establishment and operation, under regulation and control by the State, of gambling houses or casinos within the boundaries, as heretofore established, of the City of Atlantic City, county of Atlantic, and to license and tax such operations and equipment used in connection therewith. Any law authorizing the establishment and operation of such gambling establishments shall provide for the State revenues derived therefrom to be applied solely for the purpose of providing funding for reductions in property taxes, rental, telephone, gas, electric and municipal utilities charges of, eligible senior citizens and disabled residents of the State, and for additional or expanded health services or benefits or transportation services or benefits to eligible senior citizens and disabled residents, in accordance with such formulae as the Legislature shall by law provide. *The type* and number of such casinos or gambling houses and *of the gambling games which may be conducted in any such establishment shall be determined by or pursuant to the terms of the law authorizing the establishment and operation thereof.* [Emphasis supplied.]

The court therefore never had to reach the issue of whether the particular game challenged by the Division (entry-fee craps tournament) was a "variation" of the form authorized by the Constitution.

The expansion of pari-mutuel betting to an off-track site as proposed by the legislation before us is not fundamentally the same as the betting authorized by the 1939 constitutional amendment, because the proposed expansion would not be confined to the enclosure of one race track but enlarged to one or more additional tracks with the wagers being transmitted by wire to the sending track for incorporation into the pari-mutuel pool. Such a format might well afford the opportunity for interception, delay in transmission, and other illegal acts and would thus impose greater demands upon the State regulators. Plaintiff's proposal, therefore, does not conform to the specific "restrictions and control" contemplated by the 1939 amendment.

The consideration of potential evils and problems of regulation of expanded gambling as well as the fundamental public policy judgment to be made concerning such expansion are matters that must be undertaken by the voters of this State. We conclude that pari-mutuel wagering upon horse races as authorized by the Constitution may be conducted only

at the racetrack at which the race is run.  The judgment of the Appellate Division is reversed.  The provisions of the Intertrack Wagering Act, *N.J.S.A.* 5:5–100 to 109 are ineffective until they are submitted to and approved by a majority of the voters at a general election.

*For reversal*—Justices CLIFFORD, HANDLER, O'HERN, GARIBALDI and SULLIVAN (temporarily assigned) and Judges MATTHEW and FRITZ (temporarily assigned)—7.

*For affirmance*—None.