715 A.2d 1052

THE STATE OF NEW JERSEY, AND THE CASINO REINVEST-
MENT DEVELOPMENT AUTHORITY, PLAINTIFFS, v. TRUMP
HOTELS & CASINO RESORTS, INC., DEFENDANT.

Superior Court of New Jersey
Law Division
Atlantic County

May 14, 1997.

*Michael Cole* argued the cause for plaintiffs State of New Jersey and Casino Reinvestment Development Authority (*Riker Danzig Scherer Hyland & Perretti*, attorneys).

*Theodore Geiser*, attorney for plaintiff Casino Reinvestment Development Authority (*Connell Foley & Geiser*, attorneys; of counsel and on the brief).

*Peter Verniero*, Attorney General, attorney for plaintiff State of New Jersey (*Jeffrey J. Miller*, Assistant Attorney General; of counsel and on the brief).

*John J. Barry* argued the cause for defendant (*Barry & McMoran*, attorneys; *Adam N. Saravay, Thomas F. Doherty* and *Diane M. Schulze*, on the brief).

*Herbert J. Stern* for defendant (*Stern & Greenberg*, attorneys; of counsel and on the brief).

WILLIAMS, A.J.S.C.

This matter involves a challenge to urban redevelopment and environmental cleanup initiatives of the Casino Reinvestment Development Authority ("CRDA"), and the State of New Jersey ("State"). CRDA and the State seek a declaratory judgment that Article IV, § 7, ¶ 2 of the New Jersey Constitution is not violated by:

1. use of the proceeds from the sale of bonds to casino licensees or of investments made by casino licensees pursuant to *N.J.S.A.* 5:12–144.1, ("**Casino Reinvestment Act**");

2. use of parking fees collected pursuant to *N.J.S.A.* 5:12–173.1 to –173.7 by CRDA to fund "eligible projects in the corridor region of the City of Atlantic City . . .", (**"Parking Fee Act"**);

3. use of Sales and Use Tax Act receipts to reimburse a casino licensee for remediation costs pursuant to the Municipal Landfill Site Closure, Remediation and Redevelopment Act (**"Remediation Act"**), *N.J.S.A.* 13:1E–116.1 to –116.7.

Trump Hotels and Casino Resorts, Inc. ("Trump") seeks a declaratory judgment that such activities are violative of said constitutional provision.

## I

The litigation arises in the context of a dispute between Trump and plaintiffs over actions taken in connection with the development of a major new casino hotel project in Atlantic City by Mirage Resorts Incorporated ("Mirage"). At present, two casinos—Trump's Castle and Harrah's—operate in the northern, bayside section of Atlantic City, known as the Marina District. Immediately to the west of Trump's Castle sits a 178–acre parcel of land ("H–Tract"), most of which is owned by Atlantic City. That parcel, part of which was formerly a solid waste landfill, offers a prime location for multi-casino development. In order to make the H–Tract suitable for multi-casino development, however, at least two significant problems must be addressed. First, the H–Tract, as a former municipal solid waste landfill, is in need of environmental remediation. Second, the current city streets linking the Marina District to the Atlantic City Expressway are inadequate to handle the increase in traffic that new development would bring. A direct highway link between the Expressway and the Marina District would be required.

On May 3, 1996, following receipt of competitive proposals for development of the H–Tract, Atlantic City entered into an agreement ("the Development Agreement") with Mirage, a Trump competitor, in which Mirage agreed to develop a multi-casino complex on the H–Tract. As part of that contract, Mirage agreed to assume full responsibility for remediating any environmental contamination at the site. Upon completion of the remediation

and the opening of business on the site, part of Mirage's remediation costs may be reimbursable under the Remediation Act.

In addition, pursuant to the Development Agreement, Mirage's obligation to take title to and develop the H–Tract is contingent on the State agreeing to construct an adequate highway connecting the Marina District to the Atlantic City Expressway. To that end, the State signed a contract with Mirage on January 10, 1997, in which the parties agreed to construct "the Westside connector," a 2.2 mile highway linking the Marina District to the Expressway. Although it would appear that all businesses in the Marina District and the neighboring City of Brigantine will benefit from the construction of the Westside connector, Mirage has agreed to offset a significant part of the costs of constructing this public road through a contribution of $55 million in cash for the road project. Additional financing will come from the South Jersey Transportation Authority ("SJTA") which will issue bonds collateralized, in part, by $55 million in CRDA approved investment tax credits under the Casino Reinvestment Act and revenues from parking fees to be collected under the Parking Fee Act once the new casino hotels are operating.

The plan was challenged by Trump through a complaint filed in the United States District Court. In that action Trump asserted:

Defendants have agreed and resolved to violate Art. IV, § 7, ¶ 2 of the New Jersey Constitution—which strictly limits the use of revenues derived from the establishment and operation of casinos solely to the reduction of certain charges, and increase in certain benefits, to senior and disabled citizens of New Jersey ....

a. By using sales tax revenues from casino hotels to be built on the H–Tract to reimburse Mirage, pursuant to the Remediation Act, for up to 75 percent of the costs of its environmental cleanup of the H–Tract;

b. By using State revenues from casino parking fees and from casino investment alternative tax obligations to repay and collateralize bonds issued by SJTA to fund the design and construction of the Westside connector;

The State of New Jersey and CRDA responded by moving to dismiss the federal litigation and by initiating this declaratory judgment action in the New Jersey Courts. They sought an expedited hearing, asserting that the federal litigation had cast a cloud over the ability to sell CRDA bonds resulting in the threat of a $50 million default if CRDA bonds due on June 3, 1997 could not be refinanced. This court entered an order to show cause returnable May 9, 1997 which allowed for disposition of the motion in Federal Court prior to any further proceedings in New

Jersey. Trump thereafter filed a cross-motion for declaratory judgment. On May 1, 1997 the United States District Court granted the motion dismissing Trump's complaint in its entirety. The issues are now before the courts of New Jersey for resolution.

## II

The case involves a challenge to the constitutionality of the primary mechanisms through which the Legislature has facilitated hundreds of millions of dollars in redevelopment projects in Atlantic City and throughout the state. Since the adoption of the Casino Control Act in 1977, casino licensees' reinvestment obligations have totaled $520 million. These reinvestment efforts have supported projects throughout the state such as the Camden and Trenton Waterfront Projects, the Lumberton Independent Living Facility and the New Jersey Performing Arts Center in Newark. The largest capital investment has been in Atlantic City and has included, among numerous projects, over 1,000 new housing units, loan programs for home rehabilitation, substantial infrastructure improvements, and a new bus terminal.

A brief overview of the pertinent portions of each of the relevant legislative initiatives will be helpful to a clearer understanding of the issues herein.

### THE 1976 CASINO GAMBLING CONSTITUTIONAL AMENDMENT

On November 2, 1976, the voters of New Jersey approved an amendment to the N.J. Constitution permitting the Legislature to authorize the establishment and operation of gambling casinos in Atlantic City. *N.J. Const.* art. IV, § 7, ¶ 2. That amendment provided:

It shall be lawful for the Legislature to authorize by law the establishment and operation, under regulation and control by the State, of gambling houses or casinos within the boundaries, as heretofore established, of the city of Atlantic City, county of Atlantic, and to license and tax such operations and equipment used in connection therewith. Any law authorizing the establishment and operation of such gambling establishments shall provide for the State revenues derived therefrom to be applied solely for the purpose of providing funding for reductions in property taxes, rental, telephone, gas, electric, and

municipal utilities charges of, **eligible senior citizens and disabled residents of the State,** and for additional or expanded health services or benefits or transportation services or benefits to eligible senior citizens and disabled residents, in accordance with such formulae as the Legislature shall by law provide. **The type and number of such casinos or gambling houses and of the gambling games which may be conducted in any such establishment shall be determined by or pursuant to the terms of the law authorizing the establishment and operation thereof.**

[*Id.* (emphasis added).]

## THE 1977 CASINO CONTROL ACT

Thereafter, in 1977, the Casino Control Act was adopted as the enabling legislation permitted by the constitutional amendment. Among other provisions, the Act established an 8 percent tax on a casino's "gross revenues" from gaming operations as defined therein. *N.J.S.A.* 5:12–24. All sums derived from this tax were to be placed in a special fund at the Treasury referred to as the "Casino Revenue Fund," *N.J.S.A.* 5:12–145(a), which would be used exclusively for programs to assist the elderly and disabled. *N.J.S.A.* 5:12–145(c). In the same Act, the Legislature also required casinos to make capital investments in Atlantic City. The Act obligated licensees whose gross revenues exceeded the capital cost of constructing their casino facilities (as well as the costs of other capital improvements in New Jersey) to make additional investments in Atlantic City equal to at least 2 percent of their gross revenues. Any casino licensee that failed to make the required investments would be subject to a 2 percent alternative investment tax on gross revenues dedicated to the Casino Revenue Fund. *N.J.S.A.* 5:12–144(b)(3).

## THE 1984 CASINO REINVESTMENT ACT

In 1984, concerned by the lack of progress of casino investment in the redevelopment of Atlantic City, the Legislature created the Casino Reinvestment Development Authority to accelerate redevelopment and to provide a focus for reinvestment by the casinos. *N.J.S.A.* 5:12–153. Among its specific purposes, CRDA was charged to maintain public confidence in the casino gambling industry as a unique tool of urban redevelopment for Atlantic City;

to directly facilitate the redevelopment of existing blighted areas; and to address pressing social and economic needs by providing eligible projects in which casino licensees could invest. *N.J.S.A.* 5:12–160. To assist CRDA in carrying out these tasks, the investment tax obligations of the casinos were changed to require casinos either to invest 1.25 percent of their gross revenues in CRDA bonds or other investments approved by CRDA, or to pay an additional 2.5 percent of their gross revenues to the State Treasurer for the Casino Revenue Fund. *N.J.S.A.* 5:12–144.1.

THE 1993 PARKING FEE ACT

In 1993 the Legislature enacted amendments to the Casino Control Act to accelerate CRDA's efforts to develop the Atlantic City "corridor region" (the infrastructure connecting the Atlantic City Expressway to the Boardwalk). *N.J.S.A.* 5:12–173.1 to – 173.8. To fund these improvements, the Legislature imposed a $2.00 fee on consumers who parked at casino-controlled parking facilities, with $1.50 of this amount to be remitted to CRDA. *N.J.S.A.* 5:12–173.3. The casinos were statutorily required to remit this amount to CRDA regardless of whether the consumer used or ever entered the casino facility. *Id.* Proceeds from this parking fee are deposited in a special account at Treasury, to be used, among other things, for any project that CRDA determines is "related to improving highways, roads, infrastructure, traffic regulation and public safety" in the corridor region. *N.J.S.A.* 5:12–173.4. The Legislature further authorized CRDA to sell bonds to finance such projects, and to pledge parking fee proceeds to repay this indebtedness. *N.J.S.A.* 5:12–173.6 to –173.7.

THE 1996 MUNICIPAL LANDFILL SITE CLOSURE, REMEDIATION AND REDEVELOPMENT ACT

In 1996 the Legislature adopted the Municipal Landfill Site Closure, Remediation and Redevelopment Act. *N.J.S.A.* 13:1E–116.1 to 116.7. That act, designed to facilitate closure and remediation of solid waste landfills, permits a developer who closes and remediates an eligible site the opportunity to apply for reimbursement of up to 75 percent of the costs after commencement of a

business operation on the remediated site. The State makes the reimbursement from a fund comprised of one-half of all sales taxes collected from the business on that site. *N.J.S.A.* 13:1E–116.4.

### III

 Adjudication of the constitutionality of a statute is one of the most delicate tasks a court can be asked to perform. A court must be ever mindful that the challenged legislation represents the considered and collective action of a body of representatives chosen by the people of this state. Therefore, as noted by our Supreme Court, "[J]udicial decisions from the time of Chief Justice Marshall reveal an unswerving acceptance of the principle that every possible presumption favors the validity of an act of the Legislature." *N.J. Sports & Exposition Authority v. McCrane*, 61 *N.J.* 1, 8, 292 *A.*2d 545 (1972). So strong is this presumption that a legislative act will not be declared void unless its repugnancy to the Constitution is clear beyond a reasonable doubt. *State v. Muhammad*, 145 *N.J.* 23, 41, 678 *A.*2d 164 (1996); *Harvey v. Essex County Board of Freeholders*, 30 *N.J.* 381, 388, 153 *A.*2d 10 (1959); *Gangemi v. Berry*, 25 *N.J.* 1, 10, 134 *A.*2d 1 (1957). This state has a long-established principle of judicial deference to the will of the lawmakers whenever reasonable persons might differ as to whether the means devised by the Legislature to serve a public purpose conform to the Constitution. *N.J. Sports & Exposition Authority v. McCrane, supra,* 61 *N.J.* at 8, 292 *A.*2d 545; *Roe v. Kervick,* 42 *N.J.* 191, 229, 199 *A.*2d 834 (1964).

 The guiding principle of constitutional construction is to serve the intent and purpose of the relevant constitutional provision. *State v. Apportionment Com'n.,* 125 *N.J.* 375, 382, 593 *A.*2d 710 (1991). The object of construction of a constitutional provision is to give effect to the intent of the people in adopting it. *Gangemi v. Berry, supra,* 25 *N.J.* at 10, 134 *A.*2d 1. In seeking to ascertain that intent a court, must look first to the terms of the instrument itself. Where the language is unambiguous or unequivocal it must be given its true force and effect. *Atlantic City*

*Racing Assoc. v. Attorney General,* 98 *N.J.* 535, 545, 489 *A.*2d 165 (1985); *Gangemi v. Berry, supra,* 25 *N.J.* at 11, 134 *A.*2d 1; *Matthews v. State,* 187 *N.J.Super.* 1, 8, 453 *A.*2d 543 (App.Div. 1982); *appeal dismissed,* 93 *N.J.* 298, 460 *A.*2d 694 (1983); *Lloyd v. Vermeulen,* 40 *N.J.Super.* 301, 308, 123 *A.*2d 21 (App.Div.1956); *aff'd.* 22 *N.J.* 200, 125 *A.*2d 393 (1956). Absent explicit indication of special meaning, the words contained in a constitutional provision are to be given their ordinary and well understood meaning. *Levin v. Parsippany–Troy Hills Tp.,* 82 *N.J.* 174, 182, 411 *A.*2d 704 (1980); *Matthews v. State, supra,* 187 *N.J.Super.* at 7, 453 *A.*2d 543.

■ Courts must take care in construing constitutional and statutory provisions, however, because words are inexact tools at best, and often, in the words of Judge Learned Hand, "there is no surer way to misread any document than to read it literally." *Lloyd v. Vermeulen, supra,* 22 *N.J* at 205, 125 *A.*2d 393 quoting from *Guiseppi v. Walling,* 144 *F.2d* 608, 624, *aff'd sub nom Gemsco v. Walling,* 324 *U.S.* 244, 65 *S.Ct.* 605, 89 *L.Ed.* 921 (1945). Where the instrument is unclear or ambiguous, a court may look to sources beyond the instrument itself in an attempt to ascertain the fundamental intent and purpose of its provisions. *Lloyd v. Vermeulen,* 22 *N.J.* 200, 125 *A.*2d 393 (1956); *Matthews v. State, supra,* 187 *N.J.Super.* at 8, 453 *A.*2d 543; *Gualano v. Bd. of Estimate of Elizabeth School Dist.,* 72 *N.J.Super.* 7, 177 *A.*2d 580 (Law Div.1962); *aff'd* 39 *N.J.* 300, 188 *A.*2d 569 (1963).

■ In construing the legislative purpose and plan, legislative history and contemporaneous construction may well furnish important light as to that purpose and plan. *New Jersey Pharmaceutical Ass'n. v. Furman,* 33 *N.J.* 121, 130, 162 *A.*2d 839 (1960); *Lloyd v. Vermeulen, supra,* 22 *N.J.* at 206, 125 *A.*2d 393. Other appropriate sources of insight may include statutory enactments that were adopted virtually contemporaneously with approval of the constitutional amendment. *Atlantic City Racing Ass'n. v. Attorney General,* 98 *N.J.* 535, 548, 489 *A.*2d 165 (1985); *Lloyd v. Vermeulen, supra,* 22 *N.J.* at 210, 125 *A.*2d 393; *In re Hudson*

*County,* 106 *N.J.L.* 62, 75, 144 *A.* 169 (E. & A.1928). An inquiry into the intent of a constitutional provision may also benefit from relevant historical commentary. *In re Forsythe et al. Application,* 91 *N.J.* 141, 148, 450 *A.*2d 499 (1982). Finally, where contemporaneous and practical interpretation has stood unchallenged for a considerable period of time, such may be regarded as of great importance in arriving at a proper construction of a statute or constitutional provision. *New Jersey Association on Correction v. Lan,* 80 *N.J.* 199, 215, 403 *A.*2d 437 (1979); *In re Hudson County, supra,* 106 *N.J.L.* at 75, 144 *A.* 169.

## IV

Defendant Trump asserts that the provisions of the casino gambling amendment are clear and unambiguous and that the plain language of the amendment prohibits not only the program of alternative investments in CRDA bonds and CRDA approved projects under the Casino Reinvestment Act, but the use of parking fees for redevelopment purposes and the reimbursement of sales tax payments to a casino licensee under the Remediation Act as well. In support of that proposition, Trump relies upon the Appellate Division decision in *Matthews v. State,* 187 *N.J.Super.* 1, 453 *A.*2d 543 (App.Div.1982). The issue in that case was straightforward and involved whether interest on the Casino Revenue Fund was, like the Fund itself, to be dedicated solely for the benefit of senior and disabled citizens, or credited to the General Treasury. The state argued that the casino gambling amendment was ambiguous and did not control or direct the disposition of interest on the Casino Revenue Fund. The Appellate Division rejected that argument, determining in the context of that case that the phrase "revenues derived therefrom" was clear and unambiguous. The court stated, "Undeniably, interest earned on the casino tax receipts is revenue. Equally undeniable is the proposition that interest earned therefrom is 'derived' from the operation of the casinos. To be derived is to be traced 'from or to a source'." *Id.* at 8, 453 A.2d 543. It concluded that interest on

the Casino Revenue Fund was therefore to be credited to that fund.

While the Appellate Division in *Matthews* concluded that the language of the amendment was clear with respect to the issue then before it, that clarity is not evident with respect to the substantially different and more complex issues raised in this case. By way of example, does the phrase "State revenues" refer only to revenue derived from taxes or does it also refer to such other things as license fees paid to the State? Does the phrase encompass investments in redevelopment projects where there will be a return to the investor? Do the words "derived therefrom" refer only to revenues from gambling activities or do they include revenues from all non-gambling sources of income of a casino license holder as well? In creating a taxing scheme under the amendment does the Legislature have discretion to establish deductions and credits as part of that scheme?

This court is unpersuaded that any of these questions can be answered by a simple facial reading of the amendment. If the court is to be faithful to the intent and purpose of the amendment, more substantial analysis is required.

That analysis must begin with a review of the legislative history of the amendment. On January 19, 1976 Assembly Concurrent Resolution No. 126 was introduced by Assemblymen Perskie and Kupperman from Atlantic County. The measure proposed amending the Constitution of the State New Jersey to allow for casino gambling in Atlantic City. The casino amendment proposal represented an attempt to deal with the serious deterioration of Atlantic City. At one point, Atlantic City's accessability and central location in the heavily populated metropolitan corridor combined to make the city one of the major convention centers and seaside resorts in the United States. However, the city failed to maintain this prominence. By 1970, the city showed signs of serious decline. The population had decreased significantly, the unemployment rate was high, housing required replacement or rehabilitation, and the number of hotel rooms had substantially

decreased. *See* Barbara P. Lampen, *The Role of Legalized Gaming in New Jersey as a Stimulus for Tourism and Urban Redevelopment: A Regulator's Viewpoint,* 6 Seton Hall Legis. J. 55 (1982).

The public hearing on ACR–126 by the Assembly State Government and Federal and Interstate Relations Committee elicited extensive testimony on the conditions in Atlantic City and the reasons for seeking constitutional authorization of casino gambling. A sampling of this testimony is set forth below.

- [R]ecent employment figures indicate that the unemployment rolls now claim ... 37 percent of a once proud host town. Since 1970, we have experienced a loss of more than 15 major hotels, motels and restaurants which employed in excess of 3,500 employees. In a four-year period mercantile licenses have declined from 3,568 to 2,986—a barometric indicator of what is happening to our business community—or a loss of 582 mercantile licenses and another additional loss in employment approximating 4,100 people .... Welfare roles have swelled to an all-time high and the people of this state are paying for that. Due to business failures and an inability to pay, our uncollected taxes in Atlantic City alone are at a high of $6,846,922. As a matter of interest, we are currently budgeting $4 million for uncollected taxes in 1976. In 1975 we were only able to collect 82 percent of our total taxes .... Coupled with this fact is an increase in our tax rate of 57 percent in four years due to a decline in ratables .... Pure and simple, we are on an expressway to disaster and we will become a ward of the state. It is well known that we are no longer able to accommodate many of the larger national conventions, our very lifeblood. We are trying to support 50,000 people on a ten week economy and this ... is impossible. We no longer attract the much needed investment to rejuvenate our tired city. We have to expand to a 52 week economy.

 [Thomas Coggins, President of the Greater Mainland Chamber of Commerce. *Public Hearing before Assembly State Government and Federal and Interstate Relations Committee on ACR–126,* April 14, 1976, at 16A.]

- As one city decays, such as what is happening in Atlantic City, it spreads like cancer into surrounding areas and the reverse is true of a healthy city. We revitalize Atlantic City; we help the entire state. We have lost over 400 properties in Atlantic City, forcing the citizenry to pay a higher tax rate. Casino gambling could help replace those empty lots with good tax-paying property. Atlantic City is ... desperately in need of boosting our tourist industry.

 [Pierre Hollingsworth, Commissioner, City of Atlantic City. *Id.* at 35.]

- You will hear city officials here who will explain to you that we have an 80 percent collection rate on property taxes—which property tax is approaching a $9 rate. You will hear that we have some 20–25 percent of the land in Atlantic City no longer on the tax rolls. You will hear from ... officials of the Housing Authority who have been trying to market a large tract of land that is difficult, if not impossible, to attract the investment capital to build in Atlantic City. You will

hear from some of the merchants and some of the working people, the labor people in the Atlantic City community who will say that without this kind of proposal they have no resources with which to attract the kind of investment capital that will give us again the type of full-based tourist economy upon which the people of Atlantic City can build .... We have to have [casinos] if we are to continue to survive as a viable economic force, as part of this State, as the linchpin of the second largest industry in this State which is the tourist industry. We cannot do it alone. We ask nothing of the people of the State of New Jersey by way of dollars and cents. We ask only that they authorize this proposal to allow us to pull ourselves up and to invest in our own community and to attract the kind of capital that will enable us to accomplish that.

[Assemblyman Steven Perskie, Prime Sponsor of Assembly Resolution No. 126. *Id.* at 3.]

● Here is a chance for the State to take one of its cities, which is having a problem ... and without the expenditure of a dime, without any funds being appropriated from the budget, without any other part of the budget being cut to put funds into Atlantic City, with the passage of this law we can bring an entire area back to where it should be, and not only bring the area back to where it should be, and bring it out of the red and into the black, but we can derive a benefit to the entire State of New Jersey. I think most of the people who will testify here today will talk about the benefit to Atlantic City. I don't think that can be emphasized enough.

[Assemblyman Howard Kupperman, Second Prime Sponsor of ACR–126. *Id.* at 7.]

● [T]he one that is nationally and internationally recognized is Atlantic City. It is a Mecca, just as, let's say, Las Vegas is .... Recall, if you will, it took Las Vegas 35 years to get to the stage they are today. This did not occur overnight, and even should this pass, should Atlantic City get gambling, we do not anticipate an immediate resurgence of Atlantic City. It is going to be an incentive, a keystone, to attract capitalization to a resort, and attempt to rebuild it.

[Senator Joseph McGahn. *Id.* at 12.]

● We are talking specifically about the legalization of casino gambling in Atlantic City for a specific purpose, and that specific purpose is the revitalization of the tourist industry in Atlantic City. And that is what we think we need, and that is what this bill is geared at.

[Charles Worthington, County Executive of Atlantic County. *Id.* at 17.]

The legislative history, which is replete with references to the problems facing Atlantic City, indicates that the revitalization of Atlantic City was a primary concern of those supporting the constitutional amendment. It was envisioned that this revitalization would come in the form of a rejuvenated tourist industry, increased employment, capital investment, and much needed urban redevelopment. It is instructive to note that one of the prime

advocates for adoption of the amendment, was a group calling itself the Committee to Rebuild Atlantic City. *Young v. Byrne,* 144 *N.J.Super.* 10, 15, 364 *A.*2d 47 (Law Div.1976).

A second purpose to be achieved by the amendment was to raise revenue to benefit senior and disabled citizens. How this revenue would be raised was addressed by co-sponsors of the casino amendment during the public hearing before the Assembly State Government and Federal and Interstate Relations Committee on ACR–126. Assemblyman Kupperman noted, "There will be profits derived from casino gambling, not only for Atlantic City, but for the State. The State will have a take from the very top, and this money very specifically is set forth." *Public Hearing before Assembly State Government and Federal and Interstate Relations Committee on ACR–126,* April 14, 1976, at 6.

Senator McGahn, co-sponsor of the identical Senate version of ACR–126, in response to a question regarding anticipated casino revenues, made reference to a feasibility study conducted by Depodwin Associates, Inc. *Id.* at 9. That study, entitled *Feasibility of Casino Gaming for New Jersey,* which was available to members of the committee, was conducted, among other things, "to assess the merits of adding casino gaming as a source of revenue for New Jersey ...." *Id.* at 2. Significantly, the Depodwin study, which evaluated various forms of taxation used in several major countries that had legalized gambling casinos, concluded, "Our proposed choice is a straight tax on the winnings of the casino." *Id.* at 19. This tax was chosen because it provided a simple, inexpensive means of collection. The study found, "The most popular form of taxation is a tax on the gross revenues from casino gaming obtained from operators, i.e., the winnings of the house. Use of this base avoids detailed calculations of deductions and subsequent audits." *Id.* at 19. The conclusions of the study were later reflected in the testimony of Assemblyman Steven Perskie at a public hearing before the Assembly State Government and Federal and Interstate Relations Committee on the Casino Control Act. The Assemblyman proposed a straight tax

on gross revenues from gambling and commented, "Before arriving at the figure of 8 percent, we looked at some of the tax structures that exist in other jurisdictions and we tried to make a simplistic tax structure that would be a little easier to administer . . . ." *Public Hearing before Assembly State Government and Federal and Interstate Relations Committee on A–2366,* December 15, 1976, at 8.

A similar focus on the State deriving its dedicated revenue from gambling activities was expressed by Charles W. Davis, Executive Vice President of the New Jersey Hotel–Motel Association, which commissioned the Depodwin study. He stated, "ACR–126 must be looked upon with favor, since the **revenue derived from legalized gambling** will be dedicated to our senior citizens." *Public Hearing before Assembly State Government and Federal and Interstate Relations Committee on ACR–126,* April 14, 1976, at 35A (emphasis added). While testimony concerning revenues to be devoted to senior and disabled citizens was less extensive than that related to Atlantic City's redevelopment, nevertheless every witness who dealt with the subject focused on revenues derived from gambling itself as the source for state taxation. That such an understanding was commonplace prior to the vote on the referendum is further evidenced in *Young v. Byrne,* 144 *N.J.Super.* 10, 364 *A.*2d 47 (Law Div.1976). The court, in dealing with declaratory judgment actions brought to determine the constitutionality of ACR–126, observed, "ACR–126 specifically earmarks the gambling revenues to a special fund for senior citizens and disabled residents of New Jersey." *Id.* at 19, 364 *A.*2d 47. All of the pre-referendum comments focus solely on revenues derived from gambling activities as the source of dedicated funds for senior and disabled citizens.

Legislative action immediately after passage of the referendum is consistent in reaffirming and reinforcing the pre-referendum understanding. Following the passage of the casino amendment in November 1976, the same Legislature moved promptly to consider the enabling legislation. On November 22, 1976, Assem-

bly Bill No. 2366, known as the Casino Control Act, was introduced by Assemblymen Perskie and Kupperman. Six weeks following the passage of the casino amendment, on December 15, 1976, the Assembly State Government and Federal and Interstate Relations Committee held a public hearing to consider testimony on the bill. Further evidence of the intent and purpose of the casino gambling amendment can be gleaned from both the testimony at hearings as well as from the text of the legislation itself.

Perhaps nowhere is the legislative intent of the casino amendment, with respect to the redevelopment of Atlantic City, more clearly articulated than in the actual text of the Casino Control Act of 1977. *N.J.A.C.* 5:12–1. The Legislature declared that legalized casino gambling was approved by the citizens of New Jersey as a **unique tool of urban redevelopment** for Atlantic City. *N.J.S.A.* 5:12–1(b)(4). The Legislature further noted:

[T]he introduction of a limited number of casino rooms in major hotel convention complexes, permitted as an additional element in the hospitality industry of Atlantic City, **will facilitate the redevelopment of existing blighted areas and the refurbishing and expansion of existing hotel, convention, tourist, and entertainment facilities;** encourage the replacement of lost hospitality-oriented facilities; provide for judicious use of open space for leisure time and recreational activities; and attract new investment capital to New Jersey in general and to Atlantic City in particular.

[*Id.* (emphasis added).]

That the Legislature viewed casino gambling as a means toward redevelopment rather than simply as a revenue raising measure or as an end in itself was clearly evidenced in the Casino Control Act which provided:

Restricting the issuance of casino licenses to major hotel and convention facilities is designed to assure that the existing nature and tone of the hospitality industry in New Jersey and in Atlantic City is preserved, and that the casino rooms licensed pursuant to the provisions of this act are always offered and maintained as an integral element of such hospitality facilities, rather than as the industry unto themselves that they have become in other jurisdictions.

[*N.J.S.A.* 5:12–1(b)(5).]

This is consistent with the testimony of Senator McGahn in the public hearing on the casino amendment. He commented, "Now, nationwide today there are any number of states that are explor-

ing gambling by the State as a means of increasing revenue. We do not consider this, to be perfectly honest with you, as primarily a revenue producing measure." *Public Hearing before Assembly State Government and Federal and Interstate Relations Committee on ACR–126,* April 14, 1976, at 29A.

The redevelopment theme was manifest in the statutory scheme adopted by the Legislature. One of the early redevelopment strategies employed by the Legislature focused on the development and upgrading of the inventory of hotel rooms in Atlantic City. The Legislature mandated that no casino hotel could be licensed unless it contained at least 500 sleeping units meeting certain minimum statutory standards. *N.J.S.A.* 5:12–27, –83. Another strategy adopted by the Legislature required a licensee to make capital investments in approved projects or face the prospect of an additional tax. *N.J.S.A.* 5:12–144(b)(e). Specifically, a licensee, whose gross revenues exceeded the cumulative investments in the State during a particular year, was obligated to make additional investments of at least 2 percent of their gross revenues. *N.J.S.A.* 5:12–144(b). Failure to make such investment within five years would subject the licensee to an investment alternative tax in an amount equivalent to 2 percent of the gross revenue. The Legislature contemplated that these investments would be used for the following:

> [T]he improvement, furtherance, and promotion of the tourist industry in this State through the planning, acquisition, construction, improvement, maintenance and operation of recreational, entertainment, and other facilities for the public, including, without limitation a performing arts center, the beaches and shorefront of this State, and transportation facilities providing or enhancing service in resort areas of this State, or ... the improvement, furtherance, and promotion of the health and well-being of the people of the State through the planning, acquisition, construction, improvement, maintenance, and operation of a facility, project or program approved by the commission.
>
> [*N.J.S.A.* 5:12–144(d).]

The proposed Casino Control Act explicitly addressed the goal of providing economic assistance to senior and disabled citizens. The Act provided for an 8 percent tax on gross revenue which was to be dedicated to eligible senior citizens and disabled residents.

*N.J.S.A.* 5:12–144(a) and 5:12–145. The 8 percent tax was to be derived solely from "gaming operations." *N.J.S.A.* 5:12–24. It was clear, however, that casino hotels would be responsible to pay other taxes levied against businesses in New Jersey as well. This conclusion finds support in the testimony of the measure's supporters and critics alike.

Assemblyman Perskie, in discussing why an 8 percent tax was preferable over a 12 percent tax, noted:

> As I understand it, the Governor has commissioned some individuals in the Department of Treasury to focus on this whole [tax] structure. Before arriving at the figure of 8 percent, we looked at some of the tax structures that exist in other jurisdictions and we tried to make a simplistic tax structure that would be a little easier to administer, for example, than Nevada that has a county, local and a state tax, a set of table fees and what not. We also tried to provide a sufficiently sizable figure that would generate substantial revenue for the constitutionally-dedicated purpose, yet also keep in mind the economic realities of the casino industry . . . . So the direct answer to your question is I think that the 8 percent is a realistic figure. If it can be shown that 12 is a realistic figure, considering all of the criteria I have just articulated, I could support it. But I rather suspect, upon investigation, you will find, structuring the tax, as it is, on gross revenues as opposed to net revenues, and **providing in any event that the casino operators are going to be paying the corporate business tax in New Jersey or the personal income tax, whichever is applicable, and the property taxes and all of the other taxes that we have, that this is a realistic figure.**
>
> [*Public Hearing before Assembly State Government and Federal and Interstate Relations Committee on Assembly Bill No. 2366,* December 15, 1976, at 8. (emphasis added) ]

Even the opponents of gambling did not question that the Legislature could impose taxes or collect fees which would not be dedicated to seniors and the disabled. Dr. Samuel Jeanes, a leading opponent of gambling, commented:

> Now, if the entire 8 percent promised to our disabled and senior citizens is not paid to them, I believe our lawmakers will have broken faith with these citizens who have served our State so well. This was a promise and that promise ought to be kept. These gambling casinos are privately owned and privately operated, and there is no reason why the State should pay one penny of the taxpayer's money to assist their operation. **So we would recommend that the 8 percent tax on gross revenues of the casinos be allocated entirely for senior and disabled citizens as was promised and that an additional tax, not less than that now being paid by** the racetracks of New Jersey, **be levied on the gross revenue of the casinos to pay the cost of the administration of this act.**

[*Public Hearing before Assembly State Government and Federal and Interstate Relations Committee on Assembly Bill No. 2366,* December 15, 1976 at 73. (emphasis added).]

It appears that in 1976 both supporters and opponents of gambling alike understood that the constitutionally dedicated funds would come only from this 8 percent tax on gross gambling revenues and that additional taxes or charges on other aspects of casino hotel operations were not required to be dedicated to support for seniors and the disabled.

In addition to the 8 percent tax on gross revenues, the Casino Control Act imposed a fee for the issuance or renewal of a casino license, *N.J.S.A.* 5:12–139, and a licensing fee on slot machines, *N.J.S.A.* 5:12–140. The revenues from these fees were to be deposited in the Casino Control Fund for the operating expenses of the Casino Control Commission and the Division of Gaming Enforcement. *N.J.S.A.* 5:12–143. Furthermore, the Act required payment of the corporate business tax, *N.J.S.A.* 5:12–148(b), and casino licensees were also required to pay unemployment compensation taxes to the State. *N.J.S.A.* 43:21–7.

The common understanding at that time was later reflected in a 1982 article, *Casino Gambling: The Elements of Effective Control,* 6 *Seton Hall Legis, J.* 55 (1982), by R. Benjamin Cohen, former General Counsel and Director of the Legal Division of the Casino Control Commission. In discussing both the casino amendment, and the Casino Control Act, Cohen noted:

Pursuant to the authority of [the casino gaming amendment] the Legislature enacted the Casino Control Act which was signed into law on June 2, 1977, by Governor Brendan T. Byrne. This law was the culmination of legislative initiative, months of study by a Staff Policy Group on Casino Gambling designated by the Attorney General and the State Treasurer at the Governor's request, a report by the Commissioner of Investigation, and a good deal of debate and discussion in the state Legislature ....

**In addition to the revenues generated by increased corporate business taxes, property taxes, state and federal income taxes, sales taxes and luxury taxes, the Casino Control Act imposes an eight percent tax on the gross revenues of the casinos.** This gross revenues tax is deposited into a special account known as the Casino Revenue Fund. Moneys in this fund are appropriated exclusively for reductions in property taxes, rentals, and utilities charges of eligible senior citizens and disabled residents of New Jersey. The cost of the governmental regulation of

the casino gaming industry is borne by the industry itself in the form of license fees rather than by tax dollars.

[*Id.* at 3–5 (emphasis added).]

## V

The legislative history giving rise to the casino gambling amendment and the contemporaneous and subsequent legislative construction of that amendment, which has gone unchallenged for up to 20 years, is helpful in ascertaining the intent of the amendment and thereby understanding its terms. The casino gambling amendment itself did not authorize casino gambling in Atlantic City. That power was given to the Legislature to exercise in its discretion. The Legislature was also empowered to determine the type and number of casinos, the gambling games which could be conducted, the regulation and controls to be imposed, the licensing requirements for gambling operators, and the type and amount of taxation of gambling activity. It is apparent, therefore, that the amendment contemplated broad discretion on the part of the Legislature.

It is also clear that the intent of the casino gambling amendment was to give the Legislature the ability to utilize casino gambling as both a tool for urban redevelopment for Atlantic City, and a source of state revenues to benefit senior and disabled citizens through the ability to tax the newly established gambling activities. In this case Trump asserts, "[T]he inescapable conclusion is that the true purpose of the casino amendment was to raise revenue dedicated to senior citizens and the disabled and not to revitalize Atlantic City." *Trump reply brief,* page 10. There is absolutely nothing in the extensive history of the casino gambling amendment to support this assertion. The evidence is overwhelmingly to the contrary. Trump seeks to place the dual goals of the gambling amendment in a position of irreconcilable conflict. The history of the amendment gives no indication that anyone saw the dual goals as incompatible with one another. It is clear that common expectations were that both would be achieved through the amendment and the subsequent enabling legislation.

In adopting the Casino Control Act, the Legislature clearly sought to advance both purposes underlying to the amendment. It established a tax on gambling activity and created a dedicated fund from that tax for senior and disabled citizens, and it promoted redevelopment of Atlantic City by requiring capital investments by casino license holders equal to at least 2 percent of their gross revenues from gambling. Failure to make the investment would subject the license holder to a supplemental 2 percent tax for the benefit of seniors and the disabled. Given the dual purposes of the amendment, these provisions should be seen as complementing rather than conflicting with one another.

The aforesaid history also makes it clear that the revenues to be dedicated to senior and disabled citizens were the revenues to be raised by taxation of the gambling activities permitted by the amendment and authorized by the Legislature. Testimony at public hearings on the amendment by its sponsors indicated that the revenues to be dedicated to the elderly and disabled would be derived from the newly permitted gambling activity. Those same sponsors also sponsored the Casino Control Act, which was introduced in bill form within days of passage of the referendum. Both the text of the Casino Control Act and the testimony at legislative hearings on the Act evidence the understanding that it was solely the newly created tax on gambling which was to be the source for production of the dedicated revenues for senior and disabled citizens.

The Act, by its terms, created a dedicated fund for seniors and the disabled and funded it with an 8 percent tax on gross revenues from all gambling activities. Testimony on the legislation indicated that the amount of the dedicated tax was the result of careful study to ensure there was a sufficiently sizeable income stream to support the constitutionally dedicated purpose. In crafting the gambling tax, consideration was given to the fact that casino licensees would also be paying the usual other taxes to the State such as payroll taxes, sales taxes, luxury taxes and the corporate business tax. The Casino Control Act by its express terms

required the filing of a corporate business tax return and payment of taxes thereon. *N.J.S.A.* 5:12–148(b). Furthermore, the Casino Control Act also made it explicitly clear that casino license fees, as well as the annual license fees for slot machines, all of which were paid to the State, were not considered as revenue dedicated to senior and disabled citizens. *N.J.S.A.* 5:12–139 to –140. There is nothing in the record of any of those proceedings to suggest that revenues received by the State from casino licensees over and above the tax on gross revenues from gambling were ever intended to be considered dedicated revenues under the amendment.

Since 1977, this view has never been challenged although opportunity for challenge has not been wanting. The Casino Control Act has been amended numerous times since 1977, and the provision of the casino gambling amendment dealing with benefits for senior and disabled citizens was itself subject to an amending referendum before the electorate in 1981. Each of those occasions offered opportunity for public discussion, debate and review of the respective provisions and their contemporary interpretation.

While it is clear that funds for support of senior and disabled citizens were to come from taxation of gambling revenues, there is no suggestion that the Legislature's general discretion in designing a taxing scheme was intended to be otherwise limited by the amendment. Our State Constitution is not a grant, but rather a limitation of legislative power. *Gangemi v. Berry, supra* at 8, 134 *A.2d* 1; *Matthews v. State, supra* at 7, 453 *A.2d* 543. There is nothing in the language of the amendment or its history to suggest any intent to limit the Legislature from using the vehicle of tax credits to further legitimate purposes contemplated by the amendment. In designing a taxing scheme, tax credits are a common method used to further legitimate legislative purposes. *See N.J.S.A.* 27:26A–15, *N.J.S.A.* 54:10A–5.6. *N.J.S.A.* 54:10A–5.18, *N.J.S.A.* 54:10A–5.19, *N.J.S.A.* 54:10A–5.24, *N.J.S.A.* 55:19–13. The amendment specifically recognized the Legislature's inherent power to license and tax such gambling activity as it might authorize.

## VI

### A

In 1984, the Legislature adopted the Casino Reinvestment Act. *N.J.S.A.* 5:12–144.1. That act created the Casino Reinvestment Development Authority as a vehicle for facilitating redevelopment of Atlantic City and addressing pressing social and economic needs of residents of the State. It also modified the provisions of the investment alternative tax originally adopted in 1977 in the Casino Control Act. The modification dealt with, among other things, the type and amount of investment required, the amount of the alternative tax and procedures for investing or paying the tax. However, the Casino Reinvestment Act did not fundamentally change the investment alternative tax concept embodied in the 1977 Casino Control Act. The intent was still to encourage investments by casino licensees for the purpose of redevelopment.

Defendant Trump asks the court to construe the investment alternative tax program as a diversion of funds from senior and disabled citizens. However, where a challenged legislative provision can be understood in such a manner as to save its constitutionality, it is the obligation of the court to so construe it. *Daly v. Daly,* 21 *N.J.* 599, 604, 123 *A.*2d 3 (1956). In designing the taxing scheme, the Legislature first established an 8 percent tax on gambling revenues to address the purpose of providing aid to senior and disabled citizens. The Legislature then turned to the goal of urban revitalization. It is clear that after first creating the 8 percent tax, the fundamental purpose of the alternative tax provisions was not to raise revenue. As one commentary aptly observed: "The rationale for restructuring the investment alternative tax so that it could be offset by tax credits was to encourage casinos to make investments rather than pay the tax." *The Casino Reinvestment Act—A Plan For a New New Jersey,* 115 *N.J.L.J.* 152. The purpose of the alternative tax was to provide an incentive for capital investment in order to revitalize Atlantic City. That purpose, as has been recognized previously, was one of

the fundamental underpinnings of the casino gambling amendment. There was no intent to divert any revenue from senior and disabled citizens. ·Rather, the Legislature designed the provision to insure that its goals of aid to senior and disabled citizens and urban redevelopment would complement one another. If capital investment could not be achieved, then a sanction would be imposed providing for supplemental revenues for senior and disabled citizens. Rather than reading these provisions as conflicting, as Trump asserts, the court sees them as complementing one another toward achieving the dual purposes of the amendment.

The casino amendment granted the Legislature wide discretion as to the manner in which it would tax gambling. The amendment leaves the Legislature free to design its tax program in the way it deems best suited to the interests of the State, so long as the revenues it collects from its tax on gambling are dedicated to specific purposes. That restriction does not—expressly or implicitly—impinge on the Legislature's prerogative to establish a taxing system that includes deductions, credits, or allowances, including investment tax credits.

Furthermore, there is no diversion of funds because the equity interest in all funds invested remains with the investor. *N.J.S.A.* 5:12–144.1(i) provides that all investments pursuant to that section "are to be considered investments and not taxes owed or grants to the State or any political subdivision thereof. As such, a licensee shall have the possibility of the return of principal and a return on the capital invested as with other investments."

For these reasons the court concludes that the investment in bonds or other investments made pursuant to *N.J.S.A.* 5:12–144.1 are not violative of the provision of *N.J. Const.* art. IV, § 7, ¶ 2.

## B

In 1993 the Legislature enacted amendments to the Casino Control Act to deal with problems related to the construction, maintenance, operation and support of roads and infrastructure in Atlantic City, and particularly in the "corridor" region, caused by

the heavy volume of motor vehicle traffic occasioned by the attraction of casino gambling. The Legislature found that these traffic problems were precipitated by the provision of free parking by casino operations, as well as the under-development of public transportation services and a shortage of hotel accommodations for overnight stays. *N.J.S.A.* 5:12–173.1.

To address these concerns the Legislature imposed a $2.00 charge on consumers who parked at facilities owned or controlled by a casino hotel. *N.J.S.A.* 5:12–173.2. Of this charge, a fee of $1.50 was to be remitted to the State for use by CRDA for infrastructure projects and other improvements. *N.J.S.A.* 5:12–173.3–4.

While it is clear that the parking fee is revenue received by the State, it is also clear that such revenue is not derived from the activities of gambling. The fee bears no relationship to a licensee's gambling operations and is derived from gamblers and non-gamblers alike who use a casino parking facility to park in Atlantic City.

Because these revenues are not derived from gambling activity, the fees collected pursuant to *N.J.S.A.* 5:12–173.1–8 are not violative of *N.J. Const.*, art. IV, § 7, ¶ 2.

C

In 1996 the Legislature adopted the Municipal Landfill Site Closure, Remediation and Redevelopment Act. *N.J.S.A.* 13:1E–116.1 to –116.7. The Act was designed to promote the remediation and development of contaminated landfills using private instead of governmental funds. Because of the substantial expense of such remediation, and limited government funding for remediation purposes, potentially productive land often remained undeveloped for years. Such was the case with the H–Tract, the former site of a solid waste landfill.

The concept of the Remediation Act was to use private funds to remediate and develop the area and then to remit a portion of the

remediation costs to the developer from future sales tax proceeds received from the operation of a new business on the site. Since without the remediation and development there would be no ongoing business to generate sales tax receipts, the Act in essence funds the cleanup through the generation of new sales tax revenues which would otherwise not have been realized. As such, it places no net burden on the public purse. Because it reimburses only a portion of remediation costs, it is actually a revenue producing measure.

The Act itself has no relationship to the casino gambling amendment. However, the remediation of the H–Tract in this case would be effected by Mirage, a prospective casino operator. Trump therefore asserts that reimbursement of remediation costs would be barred by the casino gambling amendment on the theory that all future sales tax proceeds paid by Mirage would be State revenues which must be dedicated to senior and disabled citizens.

Trump's assertions on this claim must fail as well. As previously noted, the casino gambling amendment intended to limit use of revenues collected by the State from gambling activity. Sales tax revenues do not fall within that classification.

Furthermore, the sales tax is not a tax paid by a business. When a customer makes a taxable purchase at a retail establishment, the obligation to pay the tax is on the consumer. *Hapag–Lloyd A.G. v. Director, Div. of Taxation,* 7 *N.J.Tax* 108 (1984). While the business is obligated to collect and remit the tax (*N.J.S.A.* 54:32B–12,–18) the customer, nevertheless, remains the taxpayer.

For these reasons, reimbursement of a casino for landfill remediation costs pursuant to *N.J.S.A.* 13:1E–116.1–116.7 is not violative of the provisions of *N.J. Const.* art. IV, § 7, ¶ 2.

## VII

For the reasons outlined in this opinion, the court finds that Art. IV, § 7, ¶ 2 of the New Jersey Constitution does not bar:

(1) the use by the CRDA of the proceeds from the sale of bonds to casino licensees or of investments made by casino licensees pursuant to *N.J.S.A.* 5:12–144.1(a)(2) for eligible projects approved by the CRDA;

(2) the use of the parking fees collected pursuant to *N.J.S.A.* 5:12–173.1 to –173.7 by CRDA to fund "eligible projects in the corridor region of the City of Atlantic City in Atlantic County," pursuant to *N.J.S.A.* 5:12–173.4;

(3) the use of funds received pursuant to the Sales and Use Tax Act to reimburse a casino licensee for 75 percent of remediation costs pursuant to the Municipal Landfill Site Closure, Remediation and Redevelopment Act, *N.J.S.A.* 13:1E–116.1 to –116.7.

An Order Granting Judgment has been signed by the court.